UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **ANESTHESIA ASSOCIATES OF ANN ARBOR, PLLC**, <br><br> Plaintiff, <br><br> v. <br><br> **BLUE CROSS BLUE SHIELD OF MICHIGAN**, <br><br> Defendant. | 2:20-CV-12916 <br><br><br> **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS WITHOUT PREJUDICE** |

This case pits Michigan's largest physician-owned anesthesiology practice group, Anesthesia Associates of Ann Arbor (or "A4"), in an anti-trust lawsuit against the state's dominant health insurer, Blue Cross Blue Shield of Michigan ("BCBS-MI"). Plaintiff A4 brings claims under the Sherman Act, Clayton Act, and state law that Defendant BCBS-MI has used its dominant position as the buyer of healthcare services to pay A4's anesthesiologists artificially depressed reimbursement rates. Plaintiff also asserts that the defendant has used its position to coerce Michigan hospitals to refuse to deal with providers who leave its insurance network, to the detriment of anesthesiology patients. Finally, Plaintiff says that Defendant used its dominant position to coerce hospitals to solicit Plaintiff's own anesthesiologists in violation of private

1

non-compete and non-solicitation agreements. Defendant moves to dismiss for failure to state a claim under Rule 12(b)(6).

As explained below, the motion to dismiss will be **GRANTED WITHOUT PREJUDICE**.

## I.   Background

The following facts are alleged in Plaintiff's Complaint. *See* ECF No. 1.

### A. The parties

This suit is between a healthcare provider group and a health insurer.[1] The Plaintiff is Anesthesia Associates of Ann Arbor ("A4"), a physician-owned anesthesiology practice. ECF No. 1, PageID.21. A4 is one of the largest anesthesiology groups in Michigan. *Id*. Plaintiff's principal place of business is in Ann Arbor, Michigan. Its anesthesiologists have obtained board certification, introduced new procedures to Michigan hospitals, and lectured as professors at Wayne State University. *Id*. at PageID.5.

The Defendant is Blue Cross Blue Shield of Michigan ("BCBS" or "BCBS-MI"). ECF No. 1, PageID.54-55. Controlling at least 67% of the market in the state, Defendant is the largest commercial health insurer in Michigan. *Id*. at PageID.7. For example, Defendant insures at least 4.5

---

[1]   Two other hospital systems—Trinity Health and Beaumont Health—are not parties to this suit, but play roles in the events giving rise to this action.

million people in Michigan and another 1.6 million in other states. *Id*. at PageID.35. Defendant is also the ninth-largest health insurer in the country. The Blue Cross Blue Shield branding is administered by the Blue Cross Blue Shield Administration. *Id*. at PageID.22. One of Defendant BCBS-MI's board of directors, Rob Casalou, also serves as chief executive officer for the Trinity Health hospital system. *Id*.

Trinity Health is a national hospital network with nine hospitals in Michigan. ECF No. 1, PageID.7. Trinity has had a longstanding relationship with Plaintiff A4, so much so that it designates A4 as a "Preferred Provider." *Id*. at PageID.8-9. Beaumont is another hospital group that has shared a longstanding and fruitful partnership with Plaintiff A4 in Michigan. *Id*.

### B. The market for anesthesiology services in Michigan

Anesthesiologists keep patients alive, safe, and in comfort while they undergo invasive surgical procedures. ECF No. 1, PageID.24. They "make split-second decisions and adjustments to ensure that the patient's airways, breathing, and circulation are functioning properly." *Id*. In order to provide their services, anesthesiologists must have access to facilities where anesthesia is administered—hospitals and other medical facilities. *Id*. at PageID.7.

Anesthesiology compensation is driven by "compensation factors." *Id*. at PageID.26-27. Unique to anesthesiologists, the compensation factors consider a base factor, modifiers, time spent, and a conversion

factor. *Id*. Base factors and modifiers vary depending on the procedure being performed and the characteristics of the patient. *Id*. at PageID.27. The more complicated a procedure is, the higher the base factor will be. *Id*. Patients with greater complicating conditions are associated with higher modifiers. *Id*. Base factors and modifiers are relatively standardized across the United States, as private insurers usually adopt the base factors set by Medicare. *Id*. Time as a compensation factor is also generally standardized, and it is measured in 15-minute increments. Although anesthesiologists receive greater compensation for more complex procedures, base factors and modifiers makeup a smaller part of the overall compensation factors. As a result, they do not substantially influence the differences in compensation among anesthesiologists.

The "conversion factor" is the most significant and most variable of the factors across the country. *Id*. at PageID.28. The conversion factor accounts for geographic differences, differences in cost of care, and the quality of the anesthesiologist. For instance, an anesthesiologist in a higher cost of living area, such as Detroit, will have a higher conversion factor than one in a less populated area of Michigan. An anesthesiologist who delivers a higher quality of care will have a higher conversion factor than an anesthesiologist who delivers a lower quality of care. *Id*. Commercial insurers in a normal market, therefore, compete to sign up anesthesiologists to their networks by offering higher conversion factors than their competitors. An in-network anesthesiologist, in other words,

means that he or she has already agreed to financial terms for treating patients with a particular insurer. *Id*. at PageID.32-33.

Anesthesiology groups like Plaintiff receive compensation from three sources: hospital stipends, insurance reimbursement, and the patient's share of that reimbursement. *Id*. at PageID.40, 43. According to Plaintiff, Defendant's reimbursement rate for anesthesiologists in Michigan is in the lowest band nationally out of four bands. *Id*. at PageID.58. It is also lower than surrounding states in the Great Lakes region. This is despite the fact that Medicare's anesthesiology conversion factor for the Detroit area is one of the highest in the country. *Id*. at PageID.16. As a result of the low reimbursement rates, Plaintiff alleges that it has recently lost anesthesiologists who left to practice in neighboring Toledo, Ohio.

### C. The relationship between BCBS-MI and A4

In April 2019, Plaintiff attempted to negotiate a higher reimbursement rate with Defendant. ECF No. 1, PageID.7-8. Plaintiff notified Defendant that "it could not continue to accept BCBS-MI's artificially low rate" and that it sought to "bring BCBS-MI's conversion factor more in line with market realities." *Id*. But Defendant refused to engage in negotiations.

As a consequence of Defendant's refusal to engage in negotiations, Plaintiff announced that it would be leaving Defendant's network. *Id*. Plaintiff also announced that even though it was going out of network, it

would continue to provide the same medical care and would not charge patients any more than when it was in-network. *Id*. Instead, any conflict over rates would be resolved between Plaintiff and Defendant. *Id*.

On April 22, 2019, Rob Casalou, who serves as both the CEO of Trinity's Michigan operations and as a board member on Defendant's board of directors, reacted to Plaintiff's announcement in an email to Plaintiff. *Id*. at PageID.41-42. Casalou conveyed to Plaintiff that Defendant was concerned about the impact of Plaintiff's decision to go out of network. Defendant was considering a new process that would require anesthesiology services with its insureds to have pre-authorization from surgeons. Casalou also stated that Defendant would look to "steer work away from facilities with A4." *Id*.

A few weeks later, Plaintiff reiterated its intent to leave Defendant's network by July 15, 2019. *Id*. at PageID.42. In its statement, Plaintiff stressed that it could not continue to operate as a business with the same reimbursement rate. Plaintiff noted that it has had the same reimbursement rate for the last six years, during which the cost of providing anesthesiology services has increased. *Id*.

Plaintiff's announcement caused local hospitals—such as Trinity and Beaumont—to terminate their relationship with A4. For instance, on July 5, 2019, Beaumont issued a notice of termination with Plaintiff. *Id*. at PageID.44. After Plaintiff left Defendant's network on July 15, Trinity, which had enjoyed a relationship with Plaintiff for nearly fifty years, sent

a termination notice to Plaintiff. Trinity later explained that it could not afford to lose Defendant's business. *Id*. at PageID.44.

At the same time in July, Plaintiff further alleges that Defendant was inducing Plaintiff's anesthesiologists to breach their non-compete provisions. *Id*. at PageID.47-50. This was despite the non-solicitation agreements between Plaintiff and Trinity. Plaintiff has limited non-compete and non-solicitation agreements to protect its efforts in recruiting and retaining its anesthesiologists. Defendant was aware of these provisions because Casalou executed and was aware of such terms through his position as Trinity's CEO. *Id*. at PageID.47.

Despite the restrictive terms, Plaintiff states that in June 2019, Saint Joseph Mercy Health System, a Trinity subsidiary, circulated a document to Plaintiff's anesthesiologists practicing in its facility offering employment. *Id*. at PageID.47-48. This document promised that the subsidiary would indemnify Plaintiff's anesthesiologists against any risk from breaching their non-compete agreements. *Id*. The document also expressed concerns about Defendant's reputation as an aggressive negotiator when a provider group threatens or actually leaves its network. *Id*.

A month later, another Trinity subsidiary, Mercy Health Saint Mary's, circulated a similar document offering to indemnify Plaintiff's anesthesiologists from any breach under their non-compete agreements if they were to leave A4. *Id*. at PageID.49. In order to stop the violations,

Plaintiff sought and obtained a temporary restraining order against Trinity, Trinity's subsidiary, and Casalou in Michigan state court. The TRO restrained them from continuing to breach their contract and tortious actions against Plaintiff. *Id*. at PageID.49.

A4's business could not withstand the effects of hospitals terminating their relationships and denying access to their facilities because anesthesiologists require access to hospitals in order to provide their services. Plaintiff therefore acquiesced and went back in network with Defendant. *Id*. at PageID.51. In late October 2020, the parties along with Trinity, attempted to resolve Plaintiff's claims against Defendant. *Id*. at PageID.52. Defendant, however, again refused to engage in negotiations. Plaintiff alleges that on October 27, 2020, Defendant induced and coerced Trinity to ultimately terminate its relationship with Plaintiff, effective in 180 days. *Id*.

### D. Plaintiff's Complaint

Plaintiff's Complaint raises ten causes of action: (1) tortious interference with a contract under Michigan law; (2) civil conspiracy to commit tortious interference with a contract under Michigan law; (3) unlawful and malicious threats under Michigan law; (4) duress under Michigan law; (5) violation of Section 8 of the Clayton Act; (6) conspiracy in violation of Section 1 of the Sherman Act; (7) monopsonization in violation of Section 2 of the Sherman Act; (8) attempted monopsonization in violation of Section 2 of the Sherman Act; (9) a claim for injunctive

relief under Section 16 of the Clayton Act; and (10) claim for injunctive relief under Michigan law. *See* ECF No. 1.

On January 4, 2021, Defendant moved to dismiss Plaintiff's Complaint. *See* ECF No. 13. The Court held oral argument on the pending motion on May 26, 2021.

## II.   Legal Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits dismissal of a lawsuit where the defendant establishes the plaintiff's "failure to state a claim upon which relief can be granted." *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008). Consideration of a Rule 12(b)(6) motion is confined to the pleadings. *Id*. But courts may also look to "exhibits attached [to the complaint], public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss" without altering this standard. *Rondigo, LLC v. Twp. of Richmond*, 641 F.3d 673, 680-81 (6th Cir. 2011). In evaluating the motion, courts "must construe the complaint, accept all well-pled factual allegations as true and determine whether the plaintiff undoubtedly can prove no set of facts consistent with their allegations that would entitle them to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006)).

Though this standard is liberal, it requires a plaintiff to provide "more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action" in support of her grounds for entitlement to relief. *Albrecht v. Treon*, 617 F.3d 890, 893 (6th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). Under *Ashcroft v. Iqbal*, the plaintiff must also plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 556 U.S. 662, 678 (2009) (citation omitted). A plaintiff falls short if she pleads facts "merely consistent with a defendant's liability" or if the alleged facts do not "permit the court to infer more than the mere possibility of misconduct." *Albrecht*, 617 F.3d at 893 (quoting *Iqbal*, 556 U.S. at 678-679).

Moreover, in the context of an antitrust suit, "antitrust standing and Article III standing are not one and the same, and we not only may— but we must—reject claims under Rule 12(b)(6) when antitrust standing is missing." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449 (6th Cir. 2007). An antitrust plaintiff "must do more than make allegations of consequential harm resulting from a violation of the antitrust laws." *Id.* (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 545, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (quotations omitted)). Even though a complaint may allege that the defendant had an intent to harm the plaintiff, district courts must still consider "[o]ther relevant factors—the nature of the [claimant's] injury, the tenuous and speculative character of the relationship between the alleged antitrust violation and the [claimant's] alleged injury, the

potential for duplicative recovery or complex apportionment of damages, and the existence of more direct victims of the alleged conspiracy—weigh heavily against judicial enforcement." *Associated Gen.*, 459 U.S. at 545.

In short, antitrust standing is a "threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement," courts must dismiss it as a matter of law. *NicSand*, 507 F.3d at 450. "Lest the antitrust laws become a treble-damages sword rather than the shield against competition-destroying conduct that Congress meant them to be." *Id*. Antitrust standing "ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield. Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (emphasis in original).

## III.    Discussion

### A. Antitrust Standing

Defendant moves to dismiss Plaintiff's case for failure to state a claim under Rule 12(b)(6). *See* ECF No. 13. Although Defendant raises numerous arguments as to why the Complaint should be dismissed, the Court need only focus on the pleading-stage threshold question of antitrust standing.

Defendant argues that Plaintiff lacks antitrust standing because its Complaint fails to plead that Defendant's conduct caused an antitrust injury. Specifically, Defendant contends that Plaintiff has not plausibly pled an illegal price effect, a reduction in output, or reduction in quality.

Accordingly, the Court need only address the issue of standing because, as it will further explain below, Plaintiff's Complaint does not plausibly allege any injury "of the type that the antitrust statute was intended to forestall." *Associated Gen.*, 459 U.S. at 545.

Plaintiff responds that it has in fact alleged two types of antitrust injuries resulting from Defendant's allegedly anticompetitive conduct. First, Plaintiff alleges abuse of monopoly because Defendant has used its significant market power to impose an "artificially low rate for anesthesiology" in violation of Section 2 of the Sherman Act. ECF No. 1, PageID.17. This artificially low rate "is itself anticompetitive." *Id.* at PageID.16. Defendant's "state-wide anesthesiology conversion factor is one of the lowest in the country" even though Medicare's anesthesiology conversion factor for the Detroit area "is one of the highest in the country." *Id.*

Plaintiff states that Defendant's depressed reimbursement rates have caused the following anticompetitive violations. ECF No. 1, PageID.16-17. Plaintiff alleges that Defendant's rates are "so low that it reduces output, including by restricting the supply of anesthesiologists in Michigan." *Id.* at PageID.17. Plaintiff notes that "Michigan faces a shortage of anesthesiologists and CRNAs [Clinical registered nurse anesthetists]" and that "anesthesiology groups across Michigan have complained to BCBS that its rates are impeding their ability 'to recruit anesthesiologists to work in Michigan.'" ECF No. 22, PageID.513.

Plaintiff adds that "[b]ecause an anesthesiologist cannot be in two places at once, the volume of anesthesiology services in a market is directly tied to the number of anesthesiology providers." *Id*.

Defendant's rates have also reduced the quality of anesthesiology services. Plaintiff cites, for instance, "how Michigan patients are being deprived of the option of working with their surgeon's preferred choice of anesthesiologist." ECF No. 22, PageID.514. Plaintiff also notes how after it left Defendant's network, the replacements for Plaintiff at Beaumont hospital led to "cutbacks in weekend anesthesiology service and delayed provision of anesthesia." *Id*. In another example, consumers are harmed because "patients are restricted to choosing the anesthesiology services that BCBS is willing to pay for 'regardless of whether they are insured by BCBS-MI or some other insurer.'" *Id*.

Despite paying anesthesiologists less, Plaintiff claims that "this "artificially low conversion factor has not resulted in lower premiums for consumers." ECF No. 1, PageID.17. Plaintiff cites, for instance, data from the Kaiser Family Foundation that "shows that Michigan has some of the highest insurance premiums in the country." *Id*. Plaintiff also alleges that prices for anesthesiology services will increase because Defendant's conduct "endanger[s] the practice group model of anesthesiology." ECF No. 1, PageID.59. Anesthesiology practice groups cannot afford to stay in business under the artificially depressed reimbursement rates driven by Defendant. ECF No. 22, PageID.514-15. With the practice group model

13

destroyed, providers "would have to seek employment directly with hospitals." *Id*. And Plaintiff asserts that when anesthesiologists are employed by hospitals, the result is higher prices from the perspective of patients. *See* ECF No. 1, PageID.60.

Plaintiff further alleges as an antitrust injury that Defendant conspired with Trinity and Beaumont to shut out Plaintiff when it threatened to leave Defendant's network. Defendant "exploited its monopoly power over medical facilities and coerced those facilities into conspiring with BCBS-MI to exclude A4 from practicing medicine in Michigan" when Plaintiff threatened and did leave Defendant's network. *Id*. at PageID.13.

Plaintiff's theory is that Defendant acted in concert with hospitals to refuse "to deal with anesthesiologists who are out of BCBS's network." ECF No. 22, PageID.515. This refusal to deal protects Defendant from needing to engage in competition, enabling it "to require anesthesiologists to accept below-competitive rates." *Id*. This concerted refusal to deal, Plaintiff alleges, harms competition because it leaves anesthesiologists with no alternative. But in a competitive market, anesthesiologists would "have the option of going out of network" and still be able to practice at local hospitals. *Id*. Instead, under Defendant's domination of the market, anesthesiologists in Michigan are forced to take Defendant's artificially low reimbursement rates at a loss. This

causes "qualified and experienced anesthesiologists" to leave Michigan. *Id*. at PageID.516.

The question presented, therefore, is whether Plaintiff's allegations constitute an injury that the antitrust laws were intended to prevent. Article III standing and antitrust standing are not one and the same. District courts are required to dismiss claims under Rule 12(b)(6) when a plaintiff fails to satisfy antitrust standing. *NicSand*, 507 F.3d at 449-50. As the Sixth Circuit explained:

> Antitrust standing to sue is at the center of all antitrust law and policy. It is not a mere technicality. It is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws. The requirement of antitrust standing ensures that antitrust litigants use the laws to prevent anticompetitive action and makes certain that they will not be able to recover under the antitrust laws when the action challenged would tend to promote competition in the economic sense. Antitrust laws reflect considered policies regulating economic matters. The antitrust standing requirement makes certain that the laws are used only to deal with the economic problems whose solutions these policies were intended to effect.

*HyPoint Tech., Inc. v. Hewlett-Packard Co.*, 949 F.2d 874, 877 (6th Cir. 1991).

The Sixth Circuit elaborated on antitrust standing in *NicSand, Inc. v. 3M Co.* "[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law—lest the antitrust laws become a treble-damages sword rather than the shield against competition-destroying

conduct that Congress meant them to be." 507 F.3d at 450 (noting that "federal courts have been 'reasonably aggressive' in weeding out meritless antitrust claims at the pleading stage."); *see also Twombly*, 127 S.Ct. at 1966 ("[S]omething beyond the mere possibility of [relief] must be alleged, lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value.") (internal quotation marks omitted). Notably, the Sixth Circuit "has dismissed numerous lawsuits for lack of antitrust standing under Rule 12(b)(6)." *NicSand*, 507 F.3d at 450. (collecting cases).

The Sixth Circuit in *Southaven Land Co., Inc. v. Malone & Hyde, Inc.* summarized the test for antitrust standing as set forth by the Supreme Court. District courts assessing an antitrust claim for standing consider the following five-factor inquiry:

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused;
> (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market;
> (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative;
> (4) the potential for duplicative recovery or complex apportionment of damages; and
> (5) the existence of more direct victims of the alleged antitrust violation.

715 F.2d 1079, 1085 (6th Cir. 1983) (citing *Associated Gen.*, 459 U.S. at 537-44); *see also Re/Max Int'l Inc., v. Realty One, Inc.*, 173 F.3d 995, 1022 (6th Cir. 1999).

Having reviewed the controlling authorities on antitrust standing, the Court now turns to the application of its factors to the present case.

### i. The nature of Plaintiff's alleged injury

Plaintiff alleges that Defendant's conduct has led to reduced output and quality in the market for anesthesiology services, and has also led to increased prices for consumers. Because Defendant's reimbursement rates drive the market price and because it is relatively low, Plaintiff alleges it has "lost multiple doctors who left to practice in Toledo, Ohio." ECF No. 1, PageID.17. Defendant's low reimbursement rates have also made it more difficult for Plaintiff and other anesthesiology groups "to recruit anesthesiologists to work in Michigan." *Id.* at PageID.38. Furthermore, Defendant's conduct has deprived Michigan patients "of the option of working with their surgeon's preferred choice of anesthesiologist." ECF No. 22, PageID.514.

Defendant, on the other hand, asserts that Plaintiff's Complaint fails to allege anticompetitive harm to the market for anesthesiology services, while alleging harm to its own business instead. ECF No. 13, PageID.255. Defendant characterizes Plaintiff's position as merely alleging that its own reimbursement rates "*did not go up* as much as A4 wanted." *Id.* at PageID.255-56 (italics in original). But, Defendant

17

stresses, lower payments for anesthesiology services lead to "lower prices for customers and patients (in the form of lower provider payments for self-insured customers and lower premiums)." *Id.* at PageID.256. This, according to Defendant, "is not an 'injury' that the antitrust laws address." *Id.*

Antitrust law in the healthcare setting focuses on protecting patients from prices that are too high. In *Kartell v. Blue Shield of Massachusetts, Inc.*, the First Circuit considered whether defendant Blue Shield's reimbursement practice of banning "balance billing"— where an insurer pays doctors for treating in-network patients in exchange for doctors promising to not make any additional charge to the subscriber— constituted an unlawful restraint of trade in violation of the antitrust laws. 749 F.2d 922 (1st Cir. 1984). The First Circuit held that it did not.

In so ruling, the First Circuit opined on when and how practices affecting prices may be deemed unlawful under antitrust law. *Kartell* noted that Congress enacted the Sherman Act "as a way of protecting consumers against prices that were too high, not too low." *Id.* at 931. This is achieved, for instance, by prohibiting firms from pricing below incremental cost, otherwise known as predatory pricing. *Id.* at 927. That is because predatory pricing "harms competitors, cannot be maintained, and is unlikely to provide consumer benefits." *Id.*

In *Kartell*, the plaintiffs, a group of physicians, did not raise a claim of predatory pricing. Instead, the plaintiffs stated that the insurer used

18

its market power to impose low reimbursement rates on doctors. *Id*. at 927. Such "low prices discouraged them from introducing new highly desirable medical techniques." *Id*. The physicians maintained that "fully informed patients would have wanted to pay more for those techniques had they been allowed to do so." *Id*.

The First Circuit rejected the argument that a dominant insurer commits an antitrust injury when it uses its market power to bargain for low prices. That is because in the particular circumstances of the health insurance market, the roles insurers play on behalf of patients "are *like* those of a buyer." *Id*. at 926 (italics in original). And, relevant here, antitrust law "rarely stops the buyer of a service from trying to determine the price or characteristic of the product that will be sold." *Id*. at 925. The "more closely Blue Shield's activities resemble, in essence, those of a purchaser, the less likely that they are unlawful." *Id*.

In the Sixth Circuit, an antitrust plaintiff who challenges a competitor's pricing practices must do so under a theory of predatory pricing. In *N.W.S. Michigan, Inc. v. General Wine Liquor Co., Inc.*, the Sixth Circuit similarly considered when an antitrust plaintiff's challenge to a competitor's pricing practices gives rise to antitrust standing. 58 Fed App'x 127, 129 (6th Cir. 2003). The appellate court affirmed the district court's dismissal on the basis that the plaintiff "failed to allege predatory pricing and, as a result, did not have standing." *Id*.

In *General Wine*, the plaintiff was a liquor distributor who brought an antitrust suit against a competitor. The plaintiff alleged that defendant competitor enticed suppliers "to enter into exclusive contracts" by promising kick-backs in the form of advertising. *Id*. at 128-29. The defendant competitor would then "pass on the cost savings associated with being able to store and transport the dual supplier's spirits and wine products together." *Id*. The plaintiff alleged that this arrangement violated "regulations restricting vertical integration within the industry." *Id*. at 129. Characterizing the plaintiff's antitrust claim as an attack on the defendant's pricing practices, the district court "dismissed the case because [the plaintiff] failed to allege predatory pricing and, as a result, did not have standing." *Id*.

On appeal, the plaintiff argued that "it did not need to allege predatory pricing to satisfy the antitrust injury requirement." *Id*. The Sixth Circuit explicitly disagreed, finding that the plaintiff did not "have standing because it failed to allege predatory pricing." *Id*. The court noted that "[f]or antitrust claims based on pricing practices, the Supreme Court has adopted a strict antitrust injury rule requiring plaintiffs to allege predatory pricing." *Id*. (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-23 (1993) and *Atlantic Richfield*, 495 U.S. at 339). "When a private plaintiff complains about a defendant's prices, 'only predatory pricing has the requisite anticompetitive effect' to establish antitrust injury." *Id*. (citation omitted). "The economic rationale

20

for emphasizing predatory pricing is clear: Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." *Id*. at 129-30 (internal quotation marks omitted).

Here, Plaintiff's claim hinges on the depressed reimbursement rates as a harm causing anticompetitive injury. Thus, as with *General Wine*, Plaintiff's main antitrust claim is against Defendant's pricing practices. But rather than assert a theory of predatory pricing, Plaintiff's theory is "that BCBS has monopsony power in the market for anesthesiology services." ECF No. 22, PageID.518.[2]  Here, Plaintiff alleges that BSBS-MI uses its monopsony power to impose low reimbursement prices for anesthesiologists. It is not altogether clear, however, how insisting on low reimbursement rates results in a cognizable antitrust injury comparable to predatory pricing.

Plaintiff cites *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.* for the proposition that Defendant's use of its monopsony power to drive the market price for anesthesia results in an antitrust harm. *See* 549 U.S. at 320. And monopsonization acts as a basis for

_____

[2] "Monopsony is market power on the buy side of the market." *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007) (citation omitted). "The classical theory of monopsony envisions a market with only one buyer that uses its power to reduce the quantity purchased, thereby reducing the price that the monopsonist has to pay." Blair & Harrison, Antitrust Policy and Monopsony, 76 Cornell L. Rev. 297 (1991).

competitive harm. ECF No. 22, PageID.517-18. In *Weyerhaeuser*, the Supreme Court discussed what kind of monopsonization is unlawful under the antitrust laws. The plaintiff, a sawmill operator, sued a competitor under Section 2 of the Sherman Act. It alleged that defendant competitor attempted to monopolize the regional input market for sawlogs through predatory bidding. The district court rejected defendant's proposed jury instructions incorporating elements of the *Brooke Group* test. *Id*. at 316-17; *see also Brooke Group*, 509 U.S. at 209 (1993) (establishing that a plaintiff alleging predatory pricing must prove that rival priced its goods below cost and that rival had a dangerous probability of recouping its investment in below-cost prices after driving others out of business.). It instead entered judgment on the jury verdict in favor of plaintiff. The Ninth Circuit Court of Appeals affirmed. On appeal, the Supreme Court considered whether the *Brooke Group* test applies to claims of predatory bidding. *Id*. at 315. The Supreme Court held that it should and reversed the Ninth Circuit.

Predatory bidding "involves the exercise of market power on the market's buy, or input side." *Id*. at 312. A predatory bidder "bids up the market price of an input so high that rival buyers cannot survive." *Id*. Thus, the predatory bidder acquires monopsony power, "which is market power on the buy side of the market." *Id*. The Supreme Court opined that "[p]redatory-pricing and predatory bidding are analytically similar" and that "the close theoretical connection between monopoly and monopsony

22

suggests that similar legal standards should apply to both sorts of claims." *Id*. at 313. The Supreme Court further observed that "[b]oth involve the deliberate use of unilateral pricing measures for anticompetitive purposes and both require firms to incur certain short-term losses on the chance that they might later make supracompetitive profits." *Id*.

The anticompetitive injury defined in *Weyerhaeuser* is inapt here. Although the competitor in that case and Defendant here both hold dominant positions as buyers in their respective markets, that is as far as the comparison will go. One key difference is that, unlike the buyer in *Weyerhaeuser*, Defendant here is using its buying power to keep the price of inputs—anesthesia services—*down*. This would have the tendency to benefit Defendant's competitors, because as Plaintiff points out, "reimbursement concerns need to start with BCBS-MI since they are driving the market price for anesthesia." ECF No. 1, PageID.15-16. Other health insurers in the Michigan market function essentially as buyers for their insureds. *See Kartell*, 749 F.2d at 925. Buyers, even the competitors of buyers, favor lower prices for their inputs. And lower prices would not have the effect of driving competitors from the market. Thus, there is no risk that the monopsonist predatory buyer would be able to raise output prices to a supracompetitive level.

But a more fundamental flaw is that Plaintiff does not plausibly plead that low reimbursement rates incur short-term losses for

Defendant. *See Weyerhaeuser*, 549 U.S. at 323 ("A predatory-bidding scheme requires a buyer of inputs to suffer losses today on the chance that it will reap supracompetitive profits in the future."). Indeed, Plaintiff states that Defendant has profited from *low* reimbursement rates—not that BCBS-MI has suffered losses now so that they will be able to generate big profits later. Thus, Plaintiff's attempt to characterize Defendant's pricing practices as comparable to the anticompetitive practices outlined in *Weyerhaeuser* fails.

Next, Plaintiff asserts that competition is harmed when Defendant is insulated from competition as a result of paying anesthesiologists a depressed reimbursement rate. ECF No. 22, PageID.516. Plaintiff maintains that Defendant and the other hospitals have formed a conspiracy where anesthesiologists have to join Defendant's network, or else be excluded from practicing in hospitals in the local market. This traps anesthesiologists into accepting low reimbursement rates, which in turn discourages anesthesiologists from practicing in Michigan in the long run.

Plaintiff relies on the Third Circuit's decision in *W. Penn Allegheny Health Sys., Inc. v. UPMC* for the proposition that depressed reimbursement rates may harm competition through "suboptimal output, reduced quality, allocative inefficiencies, and (given the reductions in output) higher prices for consumers in the long run." *See UPMC*, 627 F.3d 85, 104 (3d Cir. 2010). Although *UPMC* and this case

both deal with allegations of depressed reimbursement rates, they are distinguishable. Not only are the facts in *UPMC* materially different from the situation before the Court, it is an out-of-circuit case and a review of the Sixth Circuit case law yields no cases with a similar holding.

In *UPMC*, plaintiff West Penn Allegheny Health System was the second-largest hospital system in metropolitan Pittsburgh. It brought an antitrust claim against the University of Pittsburgh Medical Center (UPMC), the area's dominant hospital system, and Highmark, Inc., the area's dominant health insurer. *Id*. West Penn brought claims under both the Sherman Act and state law, asserting that the defendants formed an unlawful conspiracy to protect one another from competition. Specifically, "the dominant hospital system used its power in the provider market to insulate the health insurer from competition, and in exchange the insurer used its power in the insurance market to strengthen the hospital system and to weaken the plaintiff." *Id*. at 91. The plaintiff also asserted an antitrust theory that UPMC attempted to monopolize the area for specialized hospital services. The defendants moved to dismiss for failure to state a claim, which the district court granted.

The alleged conspiracy was as follows. Although once locked in an intense competitive struggle, UPMC and Highmark formed a "truce." *Id*. at 93. They formed an agreement in which UPMC would "use its power in the provider market to prevent Highmark competitors from gaining a foothold in the Allegheny County market for health insurance." *Id*. In

exchange, "Highmark agreed to take steps to strengthen [UPMC] and to weaken West Penn." *Id*.

Plaintiff West Penn alleged that pursuant to the defendants' "truce," Highmark paid it artificially low reimbursement rates. *Id*. at 94. Highmark "repeatedly refused to increase them." *Id*. Highmark admitted that it paid West Penn "artificially low reimbursement rates" because it feared that if it raised them, "[UPMC] would retaliate." *Id*. at 94. The plaintiff asserted that "the amount of underpayments—*i.e.*, the difference between the reimbursements it would have received in a competitive market and those it actually received—constitutes an antitrust injury." *Id*. at 103.

The Third Circuit observed that "had Highmark been acting alone, West Penn would have little basis for challenging the reimbursement rates." *Id*. at 103. That is because dominant buyers in a market are "generally free to bargain aggressively when negotiating the prices [they] will pay for goods and services." *Id*. However, "when a firm exercises monopsony power pursuant to a conspiracy, its conduct is subject to more rigorous scrutiny." *Id*.

The question presented before the Third Circuit was whether the defendant hospital *working together with* defendant health insurer unreasonably restrained trade through their "truce." It determined that the defendants did because West Penn alleged that "Highmark paid West Penn depressed reimbursement rates, not as a result of independent

26

decisionmaking, but pursuant to a conspiracy with UPMC, under which UPMC insulated Highmark from competition in return for Highmark's taking steps to hobble West Penn." *Id*. at 104. In other words, the plaintiff's allegation of antitrust injury hinged on the formation of a conspiracy where a dominant buyer used its position to reduce competition by coercing another entity to impose artificially depressed reimbursement rates on sellers of inputs. In the case of *UPMC*, the inputs were healthcare services.

Plaintiff's Complaint here is not the same. Unlike in *UPMC* where there was a direct allegation of a conspiracy in the form of an agreement requiring each conspirator to "use its market power to protect the other from competition," *id*. at 93, there is no such agreement here. UPMC paid plaintiff West Penn "artificially low reimbursement rates" essentially *at the direction* of defendant Highmark. In other words, plaintiff plausibly alleged that the defendants in *UPMC* conspired to fix prices. *See* 627 F.3d at 94.

In contrast, A4's Complaint suggests that Defendant on its own determined what it would reimburse Plaintiff. Plaintiff's theory of a conspiracy centers not on pricing but on an agreement to refuse to deal with providers that leave Defendant's network. Crucially, Plaintiff has not alleged that Defendant and its hospital affiliates Trinity or Beaumont formed an agreement to fix prices. And under *UPMC* it was the conspiracy to fix prices—and not a unilateral decision on reimbursement

rates for anesthesiology services—that could give rise to a plausible antitrust injury. *See UPMC*, 627 F.3d at 103 (observing "the general hesitance of courts to condemn unilateral behavior…But when a firm exercises monopsony power pursuant to a conspiracy, its conduct is subject to more rigorous scrutiny."). A monopsonist stating its own willingness to pay a certain price for a particular good or service is not a cognizable antitrust injury under the reasoning of *UPMC*.

Furthermore, Plaintiff alleges that Defendant worked with Trinity and its hospitals "to restrict competition in the market for anesthesiology services by, among other things, denying anesthesiologists access to medical facilities unless they go in-network." ECF No. 1, PageID.82. In an attempt to support this claim, Plaintiff refers to an email from Casalou stating his concern about the effect on Trinity's facilities and patients if Plaintiff left Defendant's network. *Id*. at PageID.42.

But this allegation is insufficient to raise an inference of conspiracy. While Casalou and Defendant were clearly acting out of their own legitimate business interests, in the email Casalou was relaying *potential* unilateral actions by the Defendant. For instance, Casalou wrote that Defendant would "*consider* a new process" and would "*look to* steer work away from facilities with A4." *Id*. (emphasis added). Even in the light most favorable to Plaintiff, these statements only describe *potential* courses of action. It does not even assert that Defendant had already

decided on what to do, let alone that it formed an agreement with another entity.

In addition, as explained above in this subsection, Plaintiff's allegations that Defendant's low reimbursement rates tend to decrease quality and output are not sufficient to withstand a motion to dismiss. And, as explained below, it is not clear whether consumers would obtain the benefit of lower prices if Defendant paid a higher anesthesiology reimbursement rate. So, even if there had been a conspiracy between Defendant and Trinity, Plaintiff's claim would still be unavailing.

The court in *UPMC*, for instance, was concerned about combining the power of dominant buyers with the inherent dangers of conspiracies in a marketplace. That is because such restraints create the risk of "suboptimal output, reduced quality, allocative inefficiencies, and (given the reductions in output) higher prices for consumers in the long run." *UPMC*, 627 F.3d at 104. For instance, "UPMC's increased revenue came largely from the 'sweetheart' reimbursements it received from Highmark." *Id.* at 95. In *UPMC* the "sweetheart deal" in combination with the artificially depressed rates for West Penn were to the detriment of the rest of the competitors.

But here, Defendant's low reimbursement rates drive the market for anesthesiology services while also benefiting Defendant's competitors because insurers seek to pay lower reimbursement rates to their providers. Plaintiff thus fails to plead an antitrust injury. For these

reasons, Plaintiff's reliance on *UPMC* to assert that it has suffered an antitrust injury is misplaced.

Plaintiff also alleges that but-for Defendant's anticompetitive conduct, the market for healthcare services in Michigan would see an increase in the quality of anesthesiology services because the top anesthesiologists would be incentivized to work and stay in Michigan if their rates were higher. But it is not clear from the Complaint how this would also lead to more competitive prices from the perspective of the consumer. In fact, it is not clear from Plaintiff's Complaint whether it is even asserting that but-for Defendant's conduct, consumers would obtain the benefit of lower premiums.

Plaintiff approaches this argument when it alleges that prices would improve for consumers if the practice group model of anesthesiology is preserved. The theory is that if Defendant is permitted to continue to engage in its allegedly anticompetitive behavior, physician-owned anesthesiology groups would not be able to continue to practice at a loss. This would force such practice groups to close down, and individual anesthesiologists would migrate to working for hospitals. Such a migration, Plaintiff alleges, results in higher prices for consumers. This potential for harm, however, is too speculative to satisfy the pleading-stage inquiry for antitrust standing. It also undercuts the contention that Plaintiff has yet suffered any antitrust injury at this point. Finally, it is not clear how preserving one business model while increasing

anesthesiology rates would result in *lower* prices for consumers than would switching to some other costlier alternative, such as working at hospitals. Both would apparently run the risk of increased prices according to Plaintiff.

All Plaintiff alleges is that if Defendant's reimbursement rates were higher for anesthesiologists, Plaintiff would be able to retain and recruit higher quality anesthesiologists. So, it is entirely plausible that consumers would obtain the benefit of better anesthesiology services— but at a higher cost. This is not an antitrust injury because such an outcome does not clearly leave consumers better off—they may well benefit from "better" anesthesiology services, but the cost of those services would be "worse."

More critically, however, the allegations about the benefits of physician-owned provider groups that Plaintiff relies upon are painted in too broad a brush; they do not specifically apply to anesthesiologists practicing in Michigan. For example, Plaintiff claims in general that physician-owned practice groups "are an efficient method of providing quality anesthesiology services" over "the old model whereby anesthesiologists were hospital employees." ECF No. 1, PageID.60. Plaintiff cites several studies suggesting that "hospital ownership of physician practices leads to higher prices and higher levels of hospital spending." *Id.* at PageID.60 (quotations omitted). Another study showed that "between 2009 and 2012, hospital-owned physician organizations in

California incurred higher expenditures for commercial HMO enrollees for professional, hospital, laboratory, pharmaceutical, and ancillary services than did physician-owned organizations." *Id*.

Without assessing the merit of these studies, even when viewing them in the light most favorable to Plaintiff, they fail to convince because they are not applicable to the market dynamics of anesthesiologists in Michigan. The first study, for instance, draws conclusions about "higher costs and higher levels of hospital spending" for healthcare services *in general*. It says nothing about whether anesthesiology services in Michigan would increase as a result of hospital-owned practices. The number and kinds of healthcare services offered are vast. An overall increase in healthcare costs for patients says nothing about whether patients would have to pay more for anesthesiology services—which is the issue here.

The second study is unpersuasive for similar reasons. It deals with the healthcare ecosystem in California—not Michigan. General assertions about the potential for rising costs for healthcare services are akin to conclusory allegations, which are inadequate in a motion to dismiss.

At bottom, antitrust law protects consumers from anticompetitive conduct that can lead to higher prices. Antitrust standing, furthermore, protects competitors from claims that fail to plausibly allege an antitrust injury. Here, Plaintiff's Complaint falls short of this threshold inquiry.

Plaintiff articulates no predatory pricing theory and its attempt to graft a predatory bidding framework onto Defendant's pricing practices fails as well. Finally, Plaintiff does not make plausible allegations that Defendant's low reimbursement rates for anesthesiologists hurt consumers in the form of higher prices, reduced output, or reduced quality.

Accordingly, Plaintiff does not plausibly allege an antitrust injury.

### ii.   Whether Defendant's conduct was aimed at harming or actually caused harm to Plaintiff

The alleged causal chain involves Defendant conspiring with Trinity and Beaumont hospitals to pressure them to refuse to deal with providers like Plaintiff who choose to go outside of Defendant's network. This in turn enables Defendant to pay providers like Plaintiff artificially low reimbursement rates because providers need access to the hospital. Artificially low reimbursement rates then make it harder to recruit anesthesiologists, driving down quality of services and reducing output. For instance, Plaintiff alleges that BCBS's "artificially low rate for anesthesiology services has caused A4 to lose multiple anesthesiologists who left to work in Ohio." ECF No. 1, PageID.23.

Plaintiff also states that the low reimbursement rate "has also made it more difficult for A4 to compete nationally to recruit anesthesiologists." *Id.* In describing the nature of the harm, Plaintiff

begins in April 2019 when "A4 told BCBS-MI that it could not continue to accept BCBS-MI's artificially low rate." *Id*. at PageID.7. Plaintiff identifies this point as the beginning of the conspiracy between Defendant, Trinity, and other hospitals to refuse, or threaten to refuse, to deal with providers seeking to leave Defendant's network.

Defendant responds that Plaintiff has its causal chain backwards. "A4 must allege that the harm it suffered was *caused by* the conduct it challenges." ECF No. 24, PageID.613. Defendant further argues that "A4 has not alleged facts plausibly explaining how any agreement caused illegally low prices *before* it existed." *Id*. (emphasis in original). Another way of putting this is that the low reimbursement rates were already in effect before BCBS-MI, Trinity, or any other hospital systems allegedly got together to exclude A4.

A review of the Complaint shows that Plaintiff has not adequately pled the causation element to establish antitrust standing. While Plaintiff alleges that Defendant's conduct against it began in April 2019 and culminated in October 2020, its allegations of harm to competition— low reimbursement rates for anesthesiology services leads to reduced output and quality—*precede* the time period when the conspiracy was formed. For instance, Plaintiff's citations for Defendant's artificially low reimbursement rates are from 2018. ECF No. 1, PageID.55. In another instance, Plaintiff relies on a 2010 RAND study as proof that Michigan "has been facing a shortage of both anesthesiologists and CRNAs." *Id*. at

PageID.17. Taking this allegation as true does nothing to support the notion that Defendant's conduct harmed Plaintiff starting in April 2019 and onward. In other words, the alleged reduction in output has been occurring long before the events giving rise to this case.

Plaintiff states that "BCBS-MI's acts were calculated to reduce competition among commercial health insurers in Michigan." ECF No. 1, PageID.13-14. This claim is not supported by plausible allegations because the rest of the Complaint details how Defendant's actions led to reduced output and quality among anesthesiologists, as well as increased prices for consumers. However, these allegations, if true, would tend to increase competition among insurance companies because potential entrants would be incentivized to enter the commercial health insurance market by the low cost of inputs (providers) and the ability to charge relatively higher prices to buyers (insureds).

It is also not clear whether Plaintiff has adequately pled that Defendant had the requisite intent to cause the type of antitrust harm that is raised here. Although Plaintiff alleges that Defendant has intended to pay low reimbursement rates, it is not altogether clear from Plaintiff's Complaint whether Defendant also intended to reduce output and quality of services. Plaintiff needs adequate pleadings in this regard to overcome the natural inference that as a buyer of anesthesiology services on behalf of patients, Defendant has incentives to procure the best quality at the lowest price. Defendant is also incentivized to pay for

anesthesiology services at an amount it deems fit to meet the demands of its insureds.

As such, the causal factor also weighs against Plaintiff.

### iii.  The directness or indirectness of Plaintiff's injury, and the related inquiry of whether the damages are speculative

Here, Plaintiff's alleged injury—low reimbursement rates leading to reduced output and quality—is indirect because it is derivative of the harm on healthcare consumers.

In *Park Avenue Radiology Associates, P.C. v. Methodist Health Systems, Inc.*, the Sixth Circuit affirmed a district court's holding that an antitrust plaintiff lacked standing and discussed the test for determining such standing. 198 F.3d 246 (6th Cir. 1999). The plaintiffs were providers of "outpatient radiology services for patients referred to them by primary care physicians" in the area. *Id*. They brought an antitrust suit against a group of local hospitals and insurers. *Id*. The plaintiffs challenged defendants' referral policies as anticompetitive. Specifically, they alleged that their referral arrangement steered defendants' insureds, as well as non-enrollees whose plans also included plaintiffs, from choosing plaintiffs' services.

The district court dismissed the case for lack of antitrust standing. The district court stated that "reduced to its essence, plaintiffs' complaint

challenges the fundamental structure of the modern PPO, in that requiring in-plan referrals for plan patients is one of the primary means by which a PPO is able to fulfill its promise of increased patient volume for the preferred providers." *Id*. Furthermore, plaintiffs sought relief "to remove the primary bargaining tool by which PPOs are able to reduce health care providers' prices." *Id*. The result being that "consumers would therefore suffer if Plaintiffs were to prevail in this litigation." *Id*.

On appeal, the Sixth Circuit considered whether plaintiffs' complaint adequately pled antitrust standing. In applying the five-factor test, the court held that they did not. It rejected the plaintiff's claim that it suffered an antitrust injury in part because "their claimed lost profits are derivative of the alleged harm inflicted on the third parties—the healthcare consumers and their third-party providers, if any." *Id*. The court found that "the parties directly harmed due to the alleged violations are the healthcare consumers—both Health Choice members and nonmembers—and their third-party providers." *Id*. Thus, "the harm is not sufficiently causally related to the violation, and their damages are speculative in that the number of lost referrals is not easy to measure." *Id*. (citing *Associated Gen.*, 459 U.S. at 451-52). The court found that "the injury is directed to the patients, or third-party insurers as the case may be, as opposed to Plaintiffs." *Id*. The district court's dismissal for lack of antitrust standing was affirmed.

Here, the harm accruing to Plaintiff is low reimbursement rates. At the same time, Plaintiff alleges that consumers, *i.e.*, patients, are harmed because the Defendant's conduct results in reduced output and quality of anesthesiology services. These alleged harms, while related, are not in harmony with each other because Plaintiff's interest in seeking higher reimbursement rates is in direct conflict with the patients' interest in keeping insurance premiums and provider payments low. So, as with *Park Avenue*, "the harm is not sufficiently causally related to the violation." *See Park Avenue*, 198 F.3d at 246.

The factor of whether its injury was direct or indirect weighs against Plaintiff's case.

### iv.  The potential for duplicative recovery or complex apportionment of damages and the existence of more direct victims of the alleged antitrust violation

If Defendant's conduct is in fact an antitrust violation, the harms of decreased output and quality of anesthesiology services more directly impact Defendant's insureds than they do Plaintiff. The insured patients are the ones who would suffer from reduced output and a lower quality of anesthesiology services. Plaintiff's alleged injury, low reimbursement rates, is not an antitrust injury because while it challenges Defendant's pricing practices, it is neither predatory nor exclusionary. The more direct victims of the reduced output and quality are patients and

38

Defendant's competitors. In other words, other buyers of anesthesiology services—health insurers in the Michigan market.

Indeed, even Plaintiff's allegation that Defendant's low reimbursement rates increase the cost of health insurance premiums in the long run suggests that the more direct victims of high cost of health insurance are Defendant's own insureds. That is because Plaintiff's objective of obtaining higher reimbursement rates for providing anesthesia services is at direct odds with the interests of anesthesia patients, who naturally seek lower prices for those services. The existence of more direct victims of the alleged antitrust injury increases the potential for duplicative recovery.

As such, these two factors for establishing antitrust standing also weigh against Plaintiff. Without a proper basis for standing, the anti-trust claims, Counts V-IX, must be dismissed without prejudice. In the absence of any federal question jurisdiction, the Court declines to exercise supplemental jurisdiction over the state law claims, Counts I-IV, and X.  The Complaint therefore will be dismissed without prejudice.

## CONCLUSION

For all the reasons stated above, Defendant's motion to dismiss the Complaint is **GRANTED WITHOUT PREJUDICE**. Should Plaintiff wish to seek leave to amend the Complaint, **it must file a motion for leave to amend within twenty-one (21) days of the date of this Order**, or the case will be dismissed with prejudice.

**IT IS SO ORDERED.**

Dated: September 14, 2021      s/Terrence G. Berg
                              _____
                              TERRENCE G. BERG
                              UNITED STATES DISTRICT JUDGE