FILED

2024 Sep-20  PM 09:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION**<br><br>**MDL 2406** | **Master File 2:13-CV-20000-RDP**<br><br>This document relates to *Anesthesia Associates of Ann Arbor, PLLC v. Blue Cross Blue Shield of Michigan Mutual Insurance Company*, No. 2:23-cv-00461-RDP |

## PLAINTIFF ANESTHESIA ASSOCIATES OF ANN ARBOR, PLLC'S SECOND AMENDED COMPLAINT

**TABLE OF CONTENTS**

NATURE OF THE ACTION ................................................................................................ 2

    A.    Illegally Acquired Monopsony Power Distorts Markets and Harms Consumers... 6

    B.    BCBSM Is Formed in 2013 to Increase Competition in Michigan's Healthcare Markets, but Proceeds to Conspire with Other Blue Cross Blue Shield Insurers to Reduce Competition in Those Markets .................................................................. 11

    C.    BCBSM Uses Its Monopsony Power to Reduce the Quality and Quantity of Anesthesiology Care in Michigan, While Increasing Prices to Consumers. ........ 15

    D.    BCBSM's Actions Violate Section 1 and Section 2 of the Sherman Antitrust Act. .............................................................................................................................. 16

FACTUAL ALLEGATIONS ............................................................................................. 17

    I.    The Parties, Jurisdiction, and Venue .......................................................................... 17

    II.    The Anesthesiology Market .......................................................................................... 19

    A.    Anesthesiologists Require Access to Medical Facilities to Practice Medicine. ... 20

    B.    Patients and Surgeons Differentiate Between Anesthesiologists Based on Quality. .............................................................................................................................. 21

    C.    Absent Conspiracy or Monopsony, Insurers Have Incentives to Attract High-Quality Anesthesiologists. ........................................................................................ 24

    D.    Compensation for Anesthesiology Services Is Driven by Conversion Factors. ... 25

    E.    Anesthesiologists Generally Operate Out of Independent Practices. ................... 28

    III.    BCBSM Is Formed in 2013 to Replace Old BCBSM and to Increase Competition in Michigan's Healthcare Markets; However, BCBSM Subsequently Conspires with Other Blues to Reduce Competition in Those Newly Liberalized Markets. ............. 30

    A.    For Decades Prior to 2013, Old BCBSM Dominated the Healthcare Industry in Michigan and Had Monopsony Power over Anesthesiologists in Particular. ...... 30

    B.    In 2013, the Michigan Legislature Overhauled Michigan's Healthcare Markets to Eliminate Old BCBSM's Dominance. ................................................................. 36

    C.    Starting in 2014, BCBSM Conspires to Reduce Competition in Michigan's Reshaped Healthcare Markets .............................................................................. 38

IV.    BCBSM Has Used its Illegally Acquired and Illegally Maintained Monopsony Power to Reduce the Quantity and Quality of Anesthesiologists in Michigan, While Maintaining or Increasing Prices to Consumers. ...................................................... 41

    A.    BCBSM Has Set Its Uniform Price for Anesthesiology Services at a Below-Competitive Level. ............................................................................................. 42

    B.    BCBSM Is Reducing the Quantity and Quality of Anesthesiology Care in Michigan. ..................................................................................................... 45

    C.    BCBSM Has Increased the Quality-Adjusted Prices Paid by Consumers for Health Insurance and for Anesthesiology Care. ................................................... 49

V.    BCBSM Has Acquired Market Power in Each of the Relevant Markets. .................. 51

VI.    There is No Pro-Competitive Benefit Outweighing the Harms of BCBSM's Anticompetitive Conduct. ..................................................................................... 54

VII.    A4 Has Suffered Damages from BCBSM's Antitrust Violations. ............................ 54

VIII.    The *Love* Settlements Do Not Apply to A4's Claims. ........................................... 55

    First Cause of Action ........................................................................................... 56

    Second Cause of Action ........................................................................................ 57

    Third Cause of Action .......................................................................................... 59

    Fourth Cause of Action ........................................................................................ 60

REQUEST FOR RELIEF ............................................................................................. 61

JURY DEMAND ......................................................................................................... 62

This Second Amended Complaint is filed pursuant to the Court's order of August 21, 2024, directing that Plaintiff Anesthesia Associates of Ann Arbor, PLLC "file a second amended complaint consistent with Judge Berg's prior orders that sets forth Plaintiff's remaining claims in one document." 2:23-cv-00461-RDP, ECF 77.[1]  Judge Berg's relevant prior orders are his order granting in part Plaintiff's motion to amend, ECF 52, and his subsequent order dismissing and striking Plaintiff's Michigan law claims without prejudice, ECF 63.

On September 28, 2022, Judge Berg granted in part Plaintiff's motion to amend its complaint.  ECF 52 at 1.  The order permitted Plaintiff to file an amended complaint with nine causes of action—four federal antitrust claims (counts 5-8) and five Michigan law claims (counts 1-4, 9)—but denied Plaintiff's request to include allegations about a hospital conspiracy in counts 5-8.  ECF 52, at 3-4, 6, 31.  Regarding jurisdiction over the state law claims, Judge Berg held, "The Court retains supplemental jurisdiction over Plaintiff's state law claims raised in the Amended Complaint pursuant to 28 U.S.C. § 1367."  *Id.* at 31.

Consistent with that order, on October 7, 2022, Plaintiff filed an Amended Complaint with nine causes of action, including four federal counts: Conspiracy under Sherman Act § 1 (count 5); Monopsonization under Sherman Act § 2 (count 6); Attempted Monopsonization under Sherman Act § 2 (count 7); and Injunctive Relief (count 8).  ECF 53, ¶¶ 207-30.  On October 21, 2022, Defendant Blue Cross Blue Shield of Michigan Mutual Insurance Company moved to dismiss and strike the state law claims from the Amended Complaint *but not* the four federal claims.  ECF 57 at 1.  Defendant instead filed an Answer to Plaintiff's federal claims that same day.  ECF 56.

On December 29, 2022, Judge Berg revisited his prior decision to exercise supplemental jurisdiction over the state law claims and granted Defendant's motion.  ECF 63 at 6-7.  Judge Berg

---

[1] ECF references are to 2:23-cv-00461-RDP, unless otherwise noted.

struck the "allegations underlying Plaintiff's state law claims" together with the "causes of action raising Plaintiff's state law claims," and held that "without addressing the merits of Plaintiff's state law claims, the Court DISMISSES Plaintiff's state law claims without prejudice." *Id.* No other claims or allegations were dismissed or struck. *See id.* Judge Berg's order specifies which paragraphs, and portions of paragraphs, are stricken. *Id.* at 7 (striking paragraphs 28-44, 100-34, 180-206, and 231-33; striking in part paragraphs 55, 176, and 178-79;). Those allegations and claims have been removed from this pleading, consistent with Judge Berg's order. Plaintiff reserves all rights, and waives none, including appeal rights, regarding the dismissed claims.

During the August 21, 2024, status conference, counsel for Defendant took the position that Plaintiff does "not" have any Section 2 monopsony claims following Judge Berg's rulings. Transcript of Status Conference, ECF 78, at 9:3-9. That is incorrect. Judge Berg's December 29 order struck "the causes of action raising Plaintiff's state law claims" and specifically identified those paragraphs as "ECF No. 53, ¶¶ 180–206; 231–33." ECF 63 at 7. The Order did not strike paragraphs 207 through 230 of the Amended Complaint, which contained Plaintiff's four federal claims—conspiracy, monopsonization, attempted monopsonization, and injunctive relief—nor did the order dismiss those claims. *Id.*; see ECF 53, ¶¶ 207-30. Consistent with Judge Berg's orders, the Second Amended Complaint keeps each of those federal counts, which are now counts 1-4.

Plaintiff Anesthesia Associates of Ann Arbor, PLLC, by and through its undersigned attorneys, alleges as follows, upon personal knowledge as to its own acts and status and upon information and belief as to all other matters, for its Second Amended Complaint against Defendant Blue Cross Blue Shield of Michigan Mutual Insurance Company.

## NATURE OF THE ACTION

1.    This is a case about Michigan's attempt in 2013 to inject competition into its healthcare markets, competition that Defendant Blue Cross Blue Shield of Michigan Mutual

Insurance Company ("BCBSM") then conspired to suppress.  In 2013, the Michigan legislature overhauled the state's healthcare industry.  That legislation brought about the end of Michigan's former quasi-public, state-regulated provider of healthcare coverage, Blue Cross Blue Shield of Michigan, Inc. ("Old BCBSM"), which had dominated Michigan healthcare for decades.  A new entity, BCBSM, was created pursuant to that legislation on September 6, 2013.  Under the new legislative regime, BCBSM would have to compete on a level playing field with private insurers, including Blue Cross and Blue Shield entities from other states.  However, within mere months of its founding, BCBSM had taken steps to eliminate the very competition that the Michigan legislature had finally opened the door to in the state.

2.      Starting on January 1, 2014, BCBSM undertook a scheme to create monopsony power in Michigan's markets for buying healthcare services, including anesthesiology services. BCBSM's illegal actions include conspiring with other Blue Cross and Blue Shield insurers to allocate markets, fix prices, and boycott providers.  As a result, BCBSM is insulated in Michigan from competition from other Blue Cross Blue Shield insurers that, following the 2013 legislation, could otherwise have entered the Michigan markets to compete with BCBSM, including in the market for purchasing anesthesiology services.

3.      Through these actions, BCBSM has succeeded in requiring anesthesiologists in Michigan to accept its below-competitive rate, what BCBSM calls its "uniform Blue Cross contracted payment" for anesthesiology services.  By imposing a uniform and below-competitive rate across all anesthesiologists in Michigan, BCBSM has driven doctors from the state (and kept doctors from entering), resulting in shortages of anesthesiologists in Michigan.  This shortage has caused hospitals to close operating rooms for lack of anesthesiologists, which in turn forces patients to delay receiving treatment while they find alternate (and less convenient) sites of care,

during which time their conditions may worsen. BCBSM's action have also driven down the quality of anesthesiology services in the state (as high-quality anesthesiologists leave), meaning that even where a patient's surgeon believes that high-quality anesthesiology care is necessary or important, that option may not be available.

4.      One example of the pressures caused by BCBSM's anticompetitive actions is the number of cases anesthesiologists work concurrently. With doctors leaving the state because of BCBSM's below-competitive rate, those doctors remaining have had to oversee more anesthetizing locations concurrently than in years past.[2] BCBSM's anticompetitive actions have forced anesthesiologists in many hospitals in Michigan to work at a 4-to-1 staffing ratio regularly, meaning that they are responsible for providing medical directions for clinical registered nurse anesthetists ("CRNAs") in four different operating rooms (or other anesthetizing locations) concurrently. Due to BCBSM's anticompetitive actions, that staffing ratio has increased over the last decade, where previously anesthesiologists at many hospitals in Michigan regularly worked at a 3-to-1 ratio or lower.

5.      BCBSM is aware of the harms it is causing. In Fall 2020, BCBSM had a call with the Michigan Society of Anesthesiologists, with representatives from multiple anesthesiology groups in Michigan joining. On the call, those anesthesiology groups confirmed that BCBSM's rate was causing anesthesiologists to leave the state; hampering efforts to recruit anesthesiologists into Michigan; and forcing the remaining doctors to work longer hours and at higher staffing-ratios. At the meeting BCBSM admitted that its anesthesiology rate was low and needed to be increased.

---

[2] Anesthetizing locations include hospital operating rooms, procedure rooms, and delivery rooms.

6.      BCBSM benefits from reducing its purchases of anesthesiology services and the amount it pays for those services, but the costs of BCBSM's actions are imposed on anesthesiologists and on Michigan consumers through fewer and lower-quality anesthesiologists in the state.  Because high-quality anesthesiology can be central to a patient obtaining a good surgical outcome, patients or their surgeons often seek out high-quality anesthesiologists.  For patients in Michigan, that option is limited and at risk of disappearing.

7.      Because Michigan anesthesiologists' only choices, as a practical matter, are to accept BCBSM's reimbursement rate or to leave the state and practice elsewhere, many have chosen to depart (or not enter) the state.  For example, as of April 2021, Michigan had nearly one-hundred unfilled anesthesiology positions.  This lack of anesthesiologists has reduced the overall supply of anesthesiology services in Michigan available to patients, as demonstrated by the fact that hospitals have been forced to close surgery departments for lack of qualified anesthesiologists to staff them.  Despite there being so many open positions available for anesthesiologists in Michigan in recent years, a large portion of the University of Michigan's anesthesiology residents leave the state, rather than work in Michigan at BCBSM's suppressed, below-competitive rate.

8.      When these doctors leave Michigan, they are also unavailable to serve patients insured by BCBSM's competitors.  Thus, Michigan consumers are harmed by a reduction in anesthesiology care regardless of their health insurance carrier.  BCBSM is therefore able to impose supracompetitive rates on consumers for health insurance, despite decreasing the quality of its offering to consumers, leading to higher quality-adjusted prices for insurance coverage and, by extension, higher quality-adjusted prices for anesthesiology care.  The price of anesthesiology care for consumers takes into account both health insurance premiums (which the consumers

pays for coverage of medical treatments, including anesthesiology care) and out-of-pocket costs, including co-payment (a fixed payment, set by the insurer, which the patient pays per treatment), co-insurance (a percentage, set by the insurer, of the fee for a treatment that the patient pays), and deductible, or some mix of those three (for example, a subscriber may be on a plan where there is a co-payment for anesthesiology services, but no co-insurance charge).

9.      These reductions in quantity and quality as well as the increase in quality-adjusted prices constitute the classic harms to competition of monopsony: with reduced prices for inputs comes reduced purchases of inputs and, as a result, reduced output, leading to deadweight harm to both producers and consumers.

10.     As a seller of anesthesiology services that has invested heavily in delivering high-quality care to patients, Plaintiff Anesthesia Associates of Ann Arbor, PLLC ("A4") is a direct victim of BCBSM's anticompetitive conduct.  BCBSM's anticompetitive actions have led to A4 being forced to accept BCBSM's below competitive rate.

### A.      Illegally Acquired Monopsony Power Distorts Markets and Harms Consumers.

11.     Monopsony refers to market power on the buy-side of a market.  In 1948, the Supreme Court confirmed that conspiracies to create monopsony power are "the sort of combination condemned by the [Sherman] Act . . . and the persons specially injured under the treble damages claim are sellers, not customers or consumers."  *Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235 (1948).  Although conspiracies to monopsonize and to monopolize are both illegal, when assessing a monopsony claim under the antitrust laws, the "factors are reversed" from what they would be in a traditional monopoly claim.[3]

---

[3] Roger D. Blair & Jeffrey L. Harrison, *Antitrust Law & Monopsony*, 76 Cornell L. Rev. 297, 324 (1991).

12.     First, when assessing monopsony claims "the market is not the market of competing sellers"—as it would be in a monopoly claim—"but of competing buyers. This market is comprised of buyers who are seen by sellers as being reasonably good substitutes."[4]

13.     Second, while a monopolist *decreases the supply of outputs* (by selling less) *and increases the prices* at which it *sells those outputs* to consumers, a monopsonist instead *decreases the demand for inputs* (by buying less) *and decreases the prices* at which it *buys inputs.*[5] Just as an illegal monopoly is distinguished from a competitive market by the fact that it reduces output supply, an illegal monopsony is distinguished by the fact that it reduces input purchases.[6] While a legitimate buyer will seek to reduce its purchase prices so that it can *buy more* (and in turn sell more to its customers), a monopsonist will reduce its purchase prices and *buy less*.[7] Just as monopoly distorts the supply of outputs, monopsony distorts the supply of inputs, leading to a mismatch between consumer demand and the inputs necessary to meet that demand, thereby reducing consumer welfare.[8]

14.     Third, and following from the above, the direct victims of monopsony and monopoly are different. When a wholesale seller conspires with downstream firms to fix retail prices, the direct victims are consumers at the retail level, and competing sellers must make an additional showing to establish standing. By contrast, if that wholesale seller conspires to fix the prices at which it purchases raw materials or inputs, the "most direct victims" of that monopsony

---

[4] *Id.*

[5] *Id.*

[6] *See* Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles & Their Application* § 575 (4th ed.).

[7] *Id.*

[8] *Blair & Harrison*, *supra*, at 316.

are "the sellers" who "suffer a loss in revenue due to the decreased price."[9]  While consumers—ultimately—also suffer a "distinct" harm from the "restrictions in output" caused by monopsony, they are not the most direct victim; rather, the sellers (here: anesthesiologists) are the most direct victim.[10]

15.    However, when an entity possesses both monopsony and monopoly power, both sellers and consumers can suffer *direct and distinct* injuries.  On the monopsony side, the entity pays below competitive prices for inputs and decreases the amount that it purchases.  Because it is purchasing fewer inputs, it also creates fewer outputs.  Then, as a monopolist, it uses that restriction in the supply of outputs to sell to consumers at higher prices, thereby harming consumers directly as well as sellers.  These actions lead to deadweight economic harm on both the input and output sides, as prices and the quantity/quality of services are distorted from competitive levels.

16.    For example, a television network could possess both (a) monopsony power in the market for buying television programming and (b) monopoly power in the market for broadcasting television programs to consumer subscribers.  As a monopsonist, that network can pay less for television programming and in turn buy fewer television programs than it would in a competitive market (for example, it will purchase ten shows instead of twenty); in turn, on the monopoly side, the network will offer fewer television programs to its subscribers (ten shows instead of twenty), thus reducing the amount of programming that it sells while also maintaining supracompetitive prices.  Even if the network does not increase prices to consumers but instead

---

[9] *Id.*

[10] *Id.*

keeps them the same as when more programs were offered, the price per program will still go up (as there are now fewer programs), leading to higher quality-adjusted prices for consumers.

17.     As another example, a cellular service provider that possesses both monopsony and monopoly power can, as a monopsonist, pay less for, and buy less, network equipment, thus resulting in lower quality cellular service (*e.g.*, lower speeds and worse geographic coverage). On the monopoly side, the cellular provider will offer consumers a less robust cellular network while charging them the same or more, thus increasing quality-adjusted prices.

18.     As explained further below, BCBSM has created the same types of distortions (a) as a monopsonist in the market for purchasing anesthesiology services and (b) as a monopolist in the market for selling health insurance to consumers.

19.     Following Michigan's overhauling of its healthcare industry in 2013, the market for purchasing anesthesiology services in Michigan has been made up of commercial health insurers, including BCBSM (*i.e.*, insurers other than Medicare, Medicaid, or other government health-coverage programs), who compete to have anesthesiology providers serve their subscribers.[11]  An anesthesiologist keeps patients alive and in comfort while they undergo medical procedures—from childbirth to orthopedic surgery to heart transplants to intubations.

20.     Given the high-stakes involved in anesthesiology and the hands-on doctor-patient relationship that it entails, it has long been recognized that patients or their surgeons differentiate between anesthesiologists based on quality.  From patients' perspective, anesthesiology services are not fungible or commodified.  Instead, patients or their surgeons seek to work with anesthesiologists that can provide the care necessary to increase the chances of a good outcome.

---

[11] While Medicare and Medicaid do not compete in this market, they are not immune from the cross effects of BCBSM's anticompetitive actions.  For example, senior citizens on Medicare in Michigan are harmed by the lower number and quality of anesthesiologists in Michigan.

*Id.* As a result, patients will seek (or defer to their surgeons' decisions to seek) higher-quality anesthesiologists, even if doing so entails increased costs.

21.     As surgeons often have privileges at multiple hospitals, they can and do choose where to perform surgery on a patient based on where they obtain high-quality anesthesiology services. For example, Beaumont, a Michigan hospital chain, in recent years ceased working with A4 as well as another anesthesiology provider, North American Partners in Anesthesia ("NAPA"), as a result of BCBSM's illegal actions. After these staffing changes, many Beaumont surgeons shifted operations to Trinity Health Michigan ("Trinity"), a hospital system where A4 still works (albeit at a reduced capacity due to BCBSM's illegal actions).[12] Despite the potential costs and inconveniences of going to Trinity rather than Beaumont (*e.g.*, if a patient lives closer to Beaumont than Trinity), patients accepted their surgeons' decisions so that the surgeons could work with their preferred anesthesiologists.

22.     This desire for access to high-quality anesthesiology care drives competition (absent conspiracy or monopsony) among health insurance providers. Absent conspiracy or monopsony, if an insurer cannot attract a sufficient number and quality of doctors to its network, its insurance offerings will be less competitive and it will have to charge less than its peers. Thus, the demand for high-quality health care (including anesthesiology services) drives competition among insurers. Health insurers engage in this competition by working to entice anesthesiologists to join their networks, a process referred to as "participating" or going "in-

---

[12] Eric Starkman, *Bailing Out at Beaumont – 2 More Top Execs Bid Bye-Bye to CEO John Fox*, Deadline Detroit (May 26, 2021), https://www.deadlinedetroit.com/articles/28082/starkman_bailing_out_at_beaumont_--_2_more_top_execs_bid_bye-bye_to_ceo_john_fox.

network." When a provider goes in-network, that provider agrees to serve the insurer's

subscribers on pre-determined terms.

23.     One of the key terms that is agreed between an anesthesiologist and an insurer as

part of an anesthesiologist going in-network is the anesthesiologist's "conversion factor," which

is a variable that feeds into how anesthesiology fees are calculated. Conversion factors vary

based on the cost and quality of care, with higher-quality anesthesiologists commanding higher

conversion factors to go in-network. Thus, in a competitive market, insurers that wish to offer

in-network access to higher-quality anesthesiologists desired by many patients (or their

surgeons) must be willing to pay a higher conversion factor to those anesthesiologists to bring

them in-network.

> **B.     BCBSM Is Formed in 2013 to Increase Competition in Michigan's Healthcare Markets, but Proceeds to Conspire with Other Blue Cross Blue Shield Insurers to Reduce Competition in Those Markets.**

24.     BCBSM is a non-profit mutual insurance company that was organized in 2013,

pursuant to legislation intended to overhaul how insurance was regulated in Michigan and to

make healthcare markets more competitive. Prior to 2013, the healthcare industry in Michigan

did not operate like healthcare markets in other states. Prior to 2013, Michigan healthcare

markets were dominated by a state-regulated healthcare corporation: Old BCBSM.

25.     Old BCBSM was "not an insurance company." *Blue Cross & Blue Shield of

Michigan v. Comm'r of Ins.*, 179 Mich. App. 246, 252 (1989). Instead, Old BCBSM was, under

Michigan law, a healthcare corporation, a status that meant Old BCBSM had "inherent

differences" from "private insurers." *Id.* As "a unique statutory creation, distinct from a private

insurance company," Old BCBSM was granted "favored status" under Michigan law. *Blue

Cross & Blue Shield of Michigan v. Milliken*, 422 Mich. 1, 14-15 (1985). That favored status

included various "legislative privileges," including "tax exemptions" and "hospital discounts,"[13] as well as price-regulation that put a ceiling on the rates Old BCBSM could pay to healthcare providers.

26.     Michigan law also insulated Old BCBSM from interstate competition.  Michigan imposed stringent residency requirements that prevented Blue Cross and Blue Shield entities from other states from establishing their own healthcare corporations to compete with Old BCBSM in Michigan.  Likewise, Michigan law prevented Old BCBSM from owning or acquiring out-of-state insurers, unless the Attorney General determined that doing so was in the best interest of Old BCBSM's subscribers in Michigan, among other requirements.

27.     These statutory privileges and restrictions meant that Old BCBSM, as a healthcare corporation, did not compete on an even playing field with health insurers when it came to purchasing healthcare services from providers.  It operated in markets carved out by the state and in which Old BCBSM was the only competitor.  Thus, instead of, for example, a single market for purchasing anesthesiology services in Michigan, there was a market of private insurers purchasing anesthesiology services, and a market of healthcare corporations buying anesthesiology services.  Because Old BCBSM was the only healthcare corporation in Michigan, Old BCBSM controlled the niche that Michigan law had created for it.  The old "Blue Cross Blue Shield of Michigan's dominance of the commercial market was established with explicit support from the State," as former governor Rick Snyder explained in 2014.

28.     Old BCBSM's state-supported dominance ended in 2013, with the passage of Senate Bills 61 and 62, which provided a pathway for Old BCBSM's affairs to be wound down

---

[13] David L. Hollister & Patience A. Drake, *The Nonprofit Health Care Corporation Reform Act of 1980*, 14 U. Mich. J. L. Reform 433, 447 (1981).

and for a new entity to be created that would compete on equal footing with private insurers. That new entity is BCBSM. Unlike Old BCBSM, this new BCBSM is an insurer, regulated under the same terms as other insurers in Michigan. On December 31, 2013, BCBSM merged with Old BCBSM pursuant to the 2013 legislation, which provided that Old BCBSM would dissolve upon the merger, and which empowered BCBSM, as the surviving entity, "to close the affairs of the merged health care corporation [Old BCBSM] after the date of the merger." MCL § 550.1220.

29.     One set of affairs that closed automatically upon the merger was Old BCBSM's licensing arrangement with Blue Cross Blue Shield Association (the "BCBSA") and, by extension, any related arrangements with Blue Cross Blue Shield insurers ("Blues") from other states. Prior to 2013, Old BCBSM had licensed the Blue branding from the BCBSA. Old BCBSM's license provided that Old BCBSM's rights to the branding were not assignable by operation of law and further provided that the license terminated upon a reorganization of Old BCBSM. Old BCBSM's licensing arrangement with the BCBSA, and any related arrangements with the other Blues deriving from that licensing, ended on or before December 31, 2013, and did not pass to BCBSM.

30.     December 31, 2013, thus marked the first day of a significantly changed healthcare industry in Michigan. No longer was that industry dominated by a state-sanctioned healthcare corporation. No longer were out-of-state Blues shut out from competing in Michigan on equal terms with the state's homegrown Blue entity. And for anesthesiologists, no longer were they subject to a monopsony when selling their services. Instead, there was now a level playing field of insurers competing with each other and subject to competition from potential entrants, including Blues from other states. The 2013 legislation was achieving its goals.

13

31.     This new era of competition in Michigan was quickly put to an end by BCBSM, however.  The very next day, on January 1, 2014, BCBSM entered into a licensing arrangement with the BCBSA to license the Blue Cross and Blue Shield trademarks for use in Michigan. BCBSM, and the other Blues, subsequently entered into modified license agreements, dated as of November 18, 2016.

32.     Pursuant to these 2014 and 2016 agreements, BCBSM agreed with the BCBSA and other Blues to multiple anticompetitive restraints, including a horizontal conspiracy to divide the United States into separate fiefdoms in which the conspirators will not compete with each other.  Pursuant to these agreements, the country is divided into geographic markets, referred to as service areas, in which BCBSM and the other Blues will not compete with each other.  These restrictions on competition go far beyond a simple licensing arrangement.  For example, BCBSM agreed to limit its competition with other Blues even when using non-Blue Cross Blue Shield branded insurance products.

33.     These 2014 and 2016 agreements resulted in BCBSM acquiring or maintaining market power in Michigan.  Thus, contrary to Michigan's intent to create a competitive healthcare market, BCBSM can operate in Michigan essentially free from competition from the other Blues.  BCBSM in turn agreed that the other Blues can operate in their territories relatively free from competition by BCBSM.  During this time, BCBSM's conspiracy also restricted the amount of revenue generated by the Blues' non-Blue subsidiaries.  This output restriction restricted the Blues from circumventing the geographic restrictions by competing under other brand names.

34.     In addition, BCBSM agreed, through its licensing contracts, to fix prices and boycott healthcare providers outside of Michigan.  In return the other Blues agreed with BCBSM

to fix prices and to boycott providers in Michigan. Per this agreement, if A4 provides medically necessary care in Michigan to someone insured by the Blues in Wisconsin, Ohio, or Florida, for example, A4 cannot enter into a direct agreement with those insurers. Instead, A4 must submit the charges to BCBSM and accept BCBSM's rates. This price fixing and boycott conspiracy further allows BCBSM to keep its provider reimbursements low, without having to worry about competition.

C.    **BCBSM Uses Its Monopsony Power to Reduce the Quality and Quantity of Anesthesiology Care in Michigan, While Increasing Prices to Consumers.**

35.    Since January 1, 2014, when it first conspired with the other Blues, BCBSM has used that conspiracy to acquire or maintain market power illegally in Michigan, becoming a monopolist in the sale of health insurance and a monopsonist in the purchasing of healthcare services. BCBSM has used this illegally acquired, and illegally-maintained, market power to set its conversion factor at one of the lowest rates in the entire nation. Compared to the rates used in other states, BCBSM's conversion factor was, as of April 2021, one of the three lowest in the country,[14] and it had remained in the bottom nationally and regionally for years. BCBSM's rate has resulted in a chronic shortage of anesthesiologists in Michigan, one that is becoming even more acute as BCBSM's practice of imposing a below-competitive rate continues. The gulf between BCBSM's rate and those available outside Michigan shows why so many anesthesiologists are leaving the state. Based on American Society of Anesthesiologists data, Ohio's average conversion factor for anesthesiology in 2018 was about $10 higher than

---

[14] Rick Ganzi, *Michigan is Facing an Anesthesiologists Shortage, Due to Minimal Reimbursement*, Lansing State Journal (Apr. 27, 2021), https://www.lansingstatejournal.com/story/opinion/contributors/viewpoints/2021/0 4/27/gap-reimbursement-rates-anesthesiologists-hurts-health-care/7201393002/.

BCBSM's.  Based on how anesthesiology billing is calculated, a $10 difference in the conversion factor can result in a *$40 per hour* difference or more in compensation.

36.     Because doctor shortages affect insurance providers across Michigan (not just BCBSM), BCBSM has not had to lower the rates it charges to consumers, despite its service-offering declining in quality as anesthesiologists leave the state.  In fact, because BCBSM possesses monopoly power in the commercial health insurance market, controlling over two-thirds of the market, BCBSM has been able to raise prices even as it restricts the quality and quantity of anesthesiologists available to consumers.  BCBSM raised its rates by at least 2.5% for 2021, and BCBSM is seeking increases ranging from 7.5% to 11.5% for its plans in 2025. BCBSM's actions have thus increased both the nominal and the quality-adjusted prices for consumers.  Nor are high premiums the only way in which BCBSM can impose supracompetitve charges on its customers.  It can also impose higher co-payments and higher co-insurance than it would in a competitive market.

### D.     BCBSM's Actions Violate Section 1 and Section 2 of the Sherman Antitrust Act.

37.     BCBSM has no pro-competitive justification for the anticompetitive restraints it agreed to in 2014 and 2016 and that it thereafter exploited.  These restraints constitute unreasonable restraints of trade as well as *per se* violations under Section 1 and Section 2 of the Sherman Antitrust Act.  A4 has suffered, and will continue to suffer, damages from these antitrust violations.  Those damages flow directly from the anticompetitive nature of BCBSM's conduct.

**FACTUAL ALLEGATIONS**

**I.      The Parties, Jurisdiction, and Venue.**

38.      Plaintiff A4 is a physician-owned, professional limited liability organized under

Michigan law and with a principal place of business in Ann Arbor, Michigan.  Its

anesthesiologists have undergone rigorous board certification, have introduced new procedures

to Michigan hospitals, and have served as professors at Wayne State University.  A4 was

organized in Michigan in 2003, and its history dates back to the 1960s, including a predecessor

organization, Anesthesia Associates of Ann Arbor, P.C.  Over that period, A4 has grown into one

of the most respected anesthesiology practices in the state.  Its doctors work with some of the top

physicians in Michigan performing state-of-the-art procedures.  While A4 previously served

patients in Grand Rapids, Michigan, as of 2019, BCBSM's anticompetitive acts have prevented

A4 from operating in that part of the state.

39.      A4 is a seller of anesthesiology services in Michigan and sells to BCBSM.  A4

has suffered direct antitrust injury, in the form of lower revenues and lost profits, as a result of

BCBSM's conspiracy.

40.      Defendant BCBSM is the largest commercial health insurer in Michigan and one

of the largest insurers in the country.  BCBSM was organized on September 6, 2013, and is

headquartered at 600 E. Lafayette Blvd., Detroit, Michigan 48226.  Despite being formed only a

little over a decade ago, BCBSM, according to the Michigan Association of Health Plans,

controls 77% of Michigan's employer provided commercial health insurance, making Michigan

the second least competitive healthcare market in the country.  BCBSM is the only Michigan

entity licensed to use Blue Cross Blue Shield branding, which is administered by the BCBSA.

While BCBSM is nominally a nonprofit mutual health insurance company, its chief executive

officer received over *$19 million in compensation* in 2018, the highest among all Blue Cross

Blue Shield insurance companies and higher than the CEOs of almost every Michigan *for-profit* company, including major automakers.

41.     BCBSM participates in the health insurance market through various arms including BCN (which itself previously operated as multiple entities, including Blue Care Network of Southeastern Michigan and Blue Care Network of Southwestern Michigan). BCBSM coordinates and directs the operation of its various health insurance offerings, including BCN, when it comes to provider reimbursements.  BCBSM's practice with anesthesiology providers is to unilaterally set reimbursement rates for its health insurance products, so the conversion factor imposed for BCN products is the same as BCBSM's other health insurance products.  Because the various product arms of BCBSM in Michigan act as one entity in the market for purchasing anesthesiology services, they are referred to collectively as BCBSM.

42.     BCBSM is engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce. Among other things, BCBSM's artificially low rate for anesthesiology services has caused A4 to lose multiple anesthesiologists who left to work in Ohio.  Other Michigan anesthesiology providers have reported similar staffing problems.  BCBSM's low rate for anesthesiology services has also made it more difficult for A4 and other Michigan anesthesiology providers to compete nationally to recruit anesthesiologists.  BCBSM provides commercial health insurance that covers Michigan residents when they travel across state lines, purchases health care in interstate commerce when Michigan residents require health care out of state and receives payments from customers located outside Michigan.

43.     This Court has personal jurisdiction over BCBSM, because BCBSM is headquartered in and has its principal place of business in Detroit, Michigan.  Prior to being

18

transferred, this case was originally brought in the Eastern District of Michigan.  For the same reason, venue was proper when this case was originally brought in the Eastern District of Michigan under Section 12 of the Clayton Act.  15 U.S.C. § 22.  BCBSM's antitrust violations have harmed A4 in the Eastern District of Michigan and elsewhere.  The case is now before this Court pursuant to a transfer order by the Judicial Panel on Multidistrict Litigation, dated April 7, 2023.  MDL 2406, ECF 572 at 1-2.

44.     This Court has subject matter jurisdiction over A4's Clayton Act claims and jurisdiction pursuant to 15 U.S.C. § 15, 28 U.S.C. § 1331, and/or 28 U.S.C. § 1337(a).

**II.     The Anesthesiology Market**

45.     Anesthesiology is one of the most vital specialties in medicine as well as one of the most physically and mentally demanding.  The anesthesiologist is called on to perform a feat that to this day remains a miracle of medicine: keeping patients alive; safe; and in comfort; while they undergo invasive procedures.[15]  Whether the procedure lasts 20 minutes or 20 hours, the anesthesiologist is called on to make split-second decisions and adjustments to ensure that the patient's airways, breathing, and circulation are functioning properly.  Because anesthesiologists are tasked with keeping patients safe when they are at their most vulnerable, anesthesiology is known as "one of the most intense physician–patient relationships in medicine."[16]

46.     Anesthesiology covers a wide range of procedures, including cardiac anesthesiology, neuroanesthesiology, obstetric anesthesiology, and pediatric anesthesiology. During the COVID-19 pandemic, the need for anesthesiologists grew, as did the risks and

---

[15]  "It is, quite literally, the physician anesthesiologist's job to keep patients alive during invasive procedures."  *Anesthesiology Specialty Description*, Am. Med. Assoc., https://www.ama-assn.org/specialty/anesthesiology-specialty-description (last accessed Oct. 9, 2020).

[16] *Id.*

sacrifices anesthesiologists endured for their patients. COVID-19's tragic symptoms led to a sharp increase in the use of ventilators as increasing numbers of patients lost the ability to breathe on their own. Before a patient can be placed on a ventilator, they must be intubated, and it is anesthesiologists who perform this life-saving procedure, placing themselves directly at risk of infection. During the COVID-19 epidemic, anesthesiologists, including the doctors at A4, put themselves in harm's way to ensure that patients could get the care they needed.

47. The unique role of anesthesiologists in medicine has shaped the market for anesthesiology services, leading to a compensation model that is different from all other medical specialties. A4 below provides a brief background on anesthesiology and the relevant markets. This background provides context for the harm BCBSM continues to exact upon those markets, to the detriment of competition, anesthesiologists, and patients.

### A. Anesthesiologists Require Access to Medical Facilities to Practice Medicine.

48. Anesthesiology practices, A4 included, depend on access to medical facilities, such as Trinity, for work. The anesthesiologist's primary role is to perform, and to keep patients safe during, medical procedures, be they surgical, respiratory, obstetric, or otherwise. Without a medical facility for these procedures to take place, an anesthesiologist has no practice. A patient cannot visit an anesthesiologist's office, receive anesthesia, and then walk down the street to undergo surgery. With the exception of limited procedures such as pain management, anesthesia must be administered at the site of, and contemporaneous with, the patient's medical procedure. Thus, practitioners who administer anesthesia during medical procedures must have access to the facilities where those procedures are being performed.

**B.**    **Patients and Surgeons Differentiate Between Anesthesiologists Based on Quality.**

49.    Anesthesiologists are not fungible in the eyes of the patients or surgeons selecting them.  Instead patients or their surgeons differentiate between anesthesiologists based on the quality of care they deliver, with anesthesiologists offering a higher quality of care being more desirable.  *See, e.g.*, *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 22-23 & nn.34, 39 (1984), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).  For patients undergoing pain management procedures or other procedures in which the anesthesiologist is the primary treating physician, this can mean seeking out an anesthesiologist directly.  For patients who are planning to undergo surgery, quality of care is just as, if not more, important.  In those situations, the patient's surgeon will typically choose the anesthesiologist for the procedure, as the surgeon will (a) have had a greater opportunity than the patient to assess different anesthesiologists and (b) has a strong incentive to work with anesthesiologists that have the requisite skills and training to facilitate a good surgical outcome.

50.    Following from the fact that patients (or their surgeons) differentiate between anesthesiologists based on quality is the fact that when patients (or their surgeons) decide that a higher-quality anesthesiologist is necessary for a procedure, the patient can be willing to incur greater costs to receive those services.

51.    Because surgery patients are interested in receiving a good surgical outcome, they will often defer to their surgeon's choice of a high-quality anesthesiologist, even when that choice entails greater costs than a lower-quality (from the surgeon's perspective) option.  Those costs can include higher co-insurance payments for an anesthesiologist that charges higher rates or a willingness to travel farther or otherwise incur greater inconvenience to receive higher quality anesthesiology services.  The latter can mean switching hospitals to have a procedure

21

performed at a facility staffed with higher quality anesthesiologists.  Surgery patients are able to do this because surgeons often have privileges at multiple competing hospitals.

52.     For example, it has been reported that "Beaumont's best and most conscientious surgeons are increasingly choosing to perform their procedures" at a competing hospital, St. Joseph Mercy Oakland,[17] which is one of the Trinity hospitals where A4 operates.  Beaumont had previously ceased working with A4 as well as another respected anesthesiology group, NAPA, and, as a result of BCBSM's anticompetitive actions, was not able to replace those doctors with a sufficient number and quality of anesthesiologists, from surgeons' perspective, to continue providing the same level of medical care.  After Beaumont ceased working with these providers, cardiologists at Beaumont expressed "serious concerns that Northstar," the new anesthesiology provider at Beaumont, "will not be able to provide the quality of cardiac anesthesia services that we have received for several decades."[18]  Given these concerns, Beaumont surgeons and their patients went to Trinity (where A4 still works) for surgery instead, so that their surgeries can be performed in conjunction with A4 anesthesiologists.

53.     Even leaving aside the potential inconvenience caused to patients of shifting surgeries from one hospital to another, these decisions by surgeons are not sufficient to address the injuries to patients or to A4 from BCBSM's actions.  The numerous unfilled anesthesiologist positions in the state demonstrate that Michigan does not have enough anesthesiologists to meet patients' needs.  Also, the option of switching hospitals to receive care from a higher-quality

---

[17] Eric Starkman, *Bailing Out at Beaumont—More Top Execs Bid Bye-Bye to CEO John Fox*, Deadline Detroit (May 26, 2021), https://www.deadlinedetroit.com/articles/28082/starkman_bailing_out_at_beaumont_--_2_more_top_execs_bid_bye-bye_to_ceo_john_fox.

[18] Karen S. Sibert, *How Could a Patient Die from Anesthesia for a Colonoscopy?*, MedPage Today (Feb. 4, 2021), https://www.kevinmd.com/blog/2021/02/how-could-a-patient-die-from-anesthesia-for-a-colonoscopy.html.

anesthesiologist is not available to patients in emergency situations or who otherwise cannot

travel the distance necessary.  A4 itself continues to be harmed from BCBSM's anticompetitive

actions, including lower reimbursements A4 has received and opportunities to treat patients A4

has lost, including from having to cease operations at Beaumont and at parts of Trinity due to

BCBSM's below-competitive rate.

54.    Additionally, as BCBSM's conduct continues to drive high-quality

anesthesiologists out of the state, Trinity and other hospitals are at risk of losing their remaining

high-quality anesthesiologists as well, a significant loss to Michigan consumers.

55.    The shift of surgeries from Beaumont to Trinity underlines the importance to

hospitals of having high-quality anesthesiologists available on staff.  Such surgeries are often

critical to a hospital's finances, because surgeries not only generate large amounts of revenue,

they have high profit margins as well.  As Reuters reported during the pandemic, when many

hospitals were cancelling elective surgeries, "[H]igh-margin services, such as orthopedic and

heart procedures, can account for up to 80% of revenue, while infectious disease and intensive

respiratory treatments are less profitable."[19]  Aside from orthopedic and cardiac surgery, elective

surgeries generally are known to "generate high profit margins for hospitals."[20]  (The term

"elective" here does not mean merely cosmetic or optional, it includes medically-necessary

procedures that, while not needing to be performed on an emergency basis, may still be "time-

_____

[19] Robin Respaut & Rebecca Spalding, *U.S. Hospitals Halt Lucrative Procedures Amid Coronavirus Crisis, Job Cuts Follow*, Reuters (Mar. 31, 2020), https://www.reuters.com/article/us-health-coronavirus-usa-hospitals/u-s-hospitals-halt-lucrative-procedures-amid-coronavirus-crisis-job-cuts-follow-idUSKBN21I388.

[20] Sourav Bose & Serena Dasani, *Hospital Revenue Loss from Delayed Elective Surgeries*, U. Penn. Leonard Davis Institute of Health Econ. (Mar. 16, 2021), https://ldi.upenn.edu/our-work/research-updates/hospital-revenue-loss-from-delayed-elective-surgeries/.

sensitive.")[21]   Because these surgeries often require anesthesiology, hospitals that are perceived by surgeons as having lower-quality anesthesiologists risk losing out on these lucrative procedures to hospitals staffed with higher-quality anesthesiologists.

56.    Notably, "staff" in the hospital context does not necessarily mean that a doctor is employed by the hospital.  Anesthesiologists, or groups of anesthesiologists such as A4, often work instead as independent contractors who contract with the hospital to gain access to its facilities.  While these contracts may involve stipends or subsidies paid by the hospital, the anesthesiologists are expected to bill patients' insurers directly as the primary vehicle for compensation.

### C.    Absent Conspiracy or Monopsony, Insurers Have Incentives to Attract High-Quality Anesthesiologists.

57.    Absent conspiracy or monopsony, the market for insurers purchasing anesthesiology services would be aligned with the demand by patients (or their surgeons) for anesthesiologists.  Insurers will, absent conspiracy or monopsony, want to have a sufficient number and quantity of anesthesiologists in network to serve their subscribers' needs.  The process of a doctor contracting with an insurer to join the insurer's network and serve the insured's members on pre-determined terms is called going "in-network" or "participating."  To be in-network means that the anesthesiologist has contracted with the insurance company to be compensated according to an agreed formula when the anesthesiologist treats that insurer's subscribers.  If an insurer is not willing to pay competitive rates for anesthesiologists, it will have fewer high-quality anesthesiologists in its network.

---

[21] *Id.*

58.    Absent monopsony (whether created by state-law or by an illegal conspiracy), insurers need to provide patients with access to a network of anesthesiologists of sufficient size and quality, and this need drives competition among insurers in the market for purchasing anesthesiology services, which in turn leads to competitive rates.

**D.    Compensation for Anesthesiology Services Is Driven by Conversion Factors.**

59.    When assessing rates for anesthesiology services, the key metric is the conversion factor, which is typically the variable that drives differences in anesthesiology compensation. This was not always the case.  In the 1940s, anesthesiologists were often compensated with a fixed percentage, around 20%, of the cost of each surgery where they administered anesthesia.[22] This method was inefficient as it failed to tie compensation to the specific contributions anesthesiologists provide.  A relatively simple surgery might present complex issues for the anesthesiologist and vice versa.  *United States v. Am. Soc. of Anesthesiologists, Inc.*, 473 F. Supp. 147, 152 (S.D.N.Y. 1979) (hereinafter *ASA, Inc.*).

60.    In the 1950s, a new compensation model was pioneered in California, where the anesthesiologist would be paid based on multiple factors including the time spent and the complexity of the work.[23]  This system, referred to as the "Relative Value Guide" method, has continued to evolve and is used to this day in various iterations across different payers, both public and private, including Medicare.  This time-based compensation system is unique to anesthesiologists among medical practitioners.

61.    The basic inputs into compensation under the Relative Value Guide are four-fold: a base factor; modifiers; time; and a conversion factor.

---

[22] Kenneth Y. Pauker, *A History of RBRVS as a Perspective on P4P – Part 1*, Cal. Soc. Anesthesiologists Bulletin 42, 44 (Spring 2006).

[23] *Pauker, supra* at 44.

62. *Base Factors and Modifiers:* The base factor and modifiers are numerical units which vary, respectively, depending on the procedure being performed and the characteristics of the patient. More complex procedures have higher base factors, and patients with complicating conditions are associated with higher modifiers. Base factors are generally the same across the United States, with private insurers adopting the base factors used by Medicare. While the specific types of modifiers and how much they affect base compensation can vary across anesthesiologists and payers, the relatively small size of the modifiers means that they tend not to drive large differences among anesthesiology compensation.

63. *Time:* The next variable, time, reflects how long the anesthesiologist spent on the procedure, typically measured in 15-minute units from when the anesthesiologist begins preparing the patient to when the patient is placed safely under post-operative care.[24] If an anesthesiologist spends 30 minutes on the procedure, that would equate to two time units. Aside from variations on how to round to the nearest time unit as well as on what the precise start and stop points are, the time factor is generally treated the same across anesthesiologists in the United States.

64. *Conversion Factor:* The final variable, the conversion factor, is the variable that varies the most across the United States. Because the other three variables are generally the same across the country, commercial insurers compete to sign up anesthesiologists to their networks by offering higher conversion factors than their competitors. The conversion factor is intended to take into account geographic differences, differences in cost of care, and the quality

---

[24] Peter DeSocio & Vijay Saluja, *Definition of Anesthesia Time*, Am. Soc. Anesthesiologists, https://www.asahq.org/quality-and-practice-management/managing-your-practice/timely-topics-in-payment-and-practice-management/2019-relative-value-guide-updates-include-anesthesia-time-and-field-avoidance (last accessed Oct. 10, 2020).

of the anesthesiologist.  All else being equal, a practitioner in a higher cost of living area will have a higher conversion factor than one in a lower cost of living area, and an anesthesiologist that delivers higher quality of care will charge a higher conversion factor than an anesthesiologist in the same area that delivers a lower quality of care.

65.    The conversion factor is multiplied by the base compensation, modifiers, and time to yield the total allowance for the anesthesiologist's work on a given procedure.

66.    In an efficient market, the conversion factor would vary considerably across different anesthesiologists and different locations, reflecting the different value propositions that anesthesiologists present and the different costs of care.  As the *ASA, Inc.* court observed, "conversion factors often vary from physician to physician."  473 F. Supp. at 155.

67.    Even Medicare, which has the luxury of not having to follow market forces, varies its conversion factors widely both among and within states, to reflect changes in the cost of care.  For example, Medicare has two different conversion factors for Michigan.  In 2020, anesthesiologists in the Detroit area (including Macomb, Oakland, Washtenaw, and Wayne counties) were paid pursuant to a Medicare conversion factor of $23.07, one of the highest Medicare conversion factors in the country, ranking approximately 28th out of over 100 localities.

68.    If conversion factors did not vary by location, anesthesiologists would, as a practical matter, largely be pushed to practice in the lowest-cost locations.  Geographic variance in conversion factors therefore ensures that patients in high-cost areas can receive needed medical care.

69.    The conversion factors paid by commercial health insurers tend to be much higher than Medicare conversion factors.  Per one study, the average Medicare conversion factor was

about 29.1% of the average commercial conversion factor for anesthesiology.[25]  The large gap stems from a Medicare decision in the early 1990s to increase compensation for general practitioners while reducing it for anesthesiologists.  Medicare rates for anesthesiology were cut by about 40%, resulting in Medicare payments being much lower for anesthesiologists compared to many other medical practitioners.[26]  Since then, Medicare reimbursements for anesthesiologists have remained depressed, to the point where Medicare payments are not sufficient to cover the cost of practicing anesthesia.  As a result, anesthesiologists depend on payments from commercial payers to continue operating.

70.    Even with the same physician, the conversion factor may change depending on how the anesthesiology was administered.  For example, when an anesthesiologist works with a hospital-employed CRNA on a procedure, BCBSM will reduce the anesthesiologist's conversion factor by a specific percentage, with the remainder being allocated to the CRNA.  Not all health insurers in Michigan follow this practice.  Instead, other insurers, recognizing that the contributions of anesthesiologists and CRNAs to patient care are complimentary rather than zero-sum, do not reduce conversion factors when anesthesiologists and CRNAs work together.

E.    **Anesthesiologists Generally Operate Out of Independent Practices.**

71.    Just as anesthesiologist compensation changed over time, so too has the treatment of anesthesiology services.  Anesthesia practitioners originally were considered hospital

---

[25] Stanley W. Stead & Sharon K. Merrick, *ASA Survey Results for Commercial Fees Paid for Anesthesia Services – 2018*, 82 ASA Monitor 72, 72 (Oct. 2018) ("ASA Survey"), available at https://pubs.asahq.org/monitor/article/82/10/72/6203/ASA-Survey-Results-for-Commercial-Fees-Paid-for.

[26] *The Other Big Medicare Payment Problem – The Low, Low Anesthesia Conversion Factor*, Anesthesia Bus. Consultants (May 3, 2010), https://www.anesthesiallc.com/publications/anesthesia-provider-news-ealerts/428-the-other-big-medicare-payment-problem-the-low-low-anesthesia-conversion-factor.

employees and lacked the independence, respect, and pay associated with other medical professionals. *ASA, Inc.*, 473 F. Supp. at 150. Under this model, the anesthesiologist's client was the hospital, not the patient. *Id.* After World War II, anesthesiologists moved away from the employee model and instead formed collaborative practice groups. *See id.* By 1979, around 90% of all active anesthesiologists were working independently or in practice groups rather than receiving hospital salaries. *Id.*

72.     The practice group model has multiple benefits for quality of care. It provides the anesthesiologist with a collaborative work environment aimed at honing and improving his or her craft. It also provides flexibility so that surgeons can seek out anesthesiologists with whom they have a rapport and develop long-lasting working relationships, even if they have separate employers. Being independent also permits anesthesiologists to work at multiple hospitals, performing different types of procedures and dealing with different types of patients, while increasing the depth and breadth of their skills.

73.     From the hospital's perspective, the practice group model allows the hospital to avoid the costs of recruiting, training, and managing anesthesiologists that would otherwise come with employing anesthesiologists directly. "[H]ospital employment" of anesthesiologists, by contrast, is considered "an option of last resort" for the hospital.[27]

---

[27] Tony Mira, *Is Hospital Employment Inevitable for Anesthesia Providers*, Anesthesia Business Consultants (Sept. 9, 2019), https://www.anesthesiallc.com/publications/anesthesia-provider-news-ealerts/1244-is-hospital-employment-inevitable-for-anesthesia-providers.

### III. BCBSM Is Formed in 2013 to Replace Old BCBSM and to Increase Competition in Michigan's Healthcare Markets; However, BCBSM Subsequently Conspires with Other Blues to Reduce Competition in Those Newly Liberalized Markets.

#### A. For Decades Prior to 2013, Old BCBSM Dominated the Healthcare Industry in Michigan and Had Monopsony Power over Anesthesiologists in Particular.

74.    As of January 1, 2013, Michigan's health industry had been dominated for decades by a single entity, Old BCBSM.  Old BCBSM was formed pursuant to Michigan law in 1975, when two previous Michigan statutory-creations, Blue Cross of Michigan and Blue Shield of Michigan, were consolidated into Old BCBSM.  Old BCBSM was, by law, not an insurer, and Michigan governed Old BCBSM under legislation designed to "distinguish [Old] BCBSM from an insurance business and to eliminate any confusion in identity with that of an insurance company."[28]  Old BCBSM was a quasi-public charitable and benevolent institution, the state's only healthcare corporation.  *See* MCL § 550.1102.[29]  It was created as a "charitable trust for the benefit of Michigan's citizens."[30]  As a healthcare corporation, Michigan law provided that Old BCBSM "shall not be subject to the laws of this state with respect to insurance corporations, except as provided in this act" and "shall not be subject to the laws of this state with respect to corporations generally."  MCL § 550.1201.

75.    As the only healthcare corporation in Michigan, Old BCBSM's status brought with it obligations, and privileges, that were unique to Old BCBSM.  A primary purpose of Old BCBSM's enabling statute was "to promote an appropriate distribution of health care services for all residents of this state," Michigan.  *Id.* § 550.1102.  To achieve that purpose, Michigan imposed specific mandates on Old BCBSM.  Those included a requirement to subsidize

---

[28] Michigan Attorney General Op. No. 7115 (July 30, 2002).

[29] Hollister & Drake, *supra*, at 433 (explaining that the Old BCBSM was "semi-public").

[30] Michigan Attorney General Op. No. 7115 (July 30, 2002).

healthcare coverage for qualifying persons and a requirement to serve as the last resort provider

of healthcare coverage to those that could not otherwise obtain it.

76.    Because Old BCBSM was subject to mandates that private insurers did not have,

Michigan law took several steps to insulate Old BCBSM from competition with those private

insurers.  Unlike Michigan insurers, Old BCBSM was not subject to state and local taxes, an

exemption that by its final years was saving Old BCBSM around $100 million annually.  Old

BCBSM also enjoyed "hospital discounts" as one of its "special legislative privileges."[31]  Old

BCBSM, at times, was also exempt from laws that barred private insurers from rebates; for

example, Old BCBSM offered to open deposit accounts at Michigan banks if they contracted

with Old BCBSM for health coverage.[32]

77.    In 1980, the Michigan legislature enacted Public Act 350, which furthered Old

BCBSM's separation from competitive healthcare markets.  Public Act 350 enhanced Old

BCBSM's monopsony power over healthcare providers and directed Old "BCBSM to use its

dominant market position to engage in more effective cost containment programs." *Blue Cross

& Blue Shield of Michigan v. Milliken*, 422 Mich. 1, 40-41 (1985).

78.    One of those cost containment programs under Public Act 350 was its cap on the

rates paid to healthcare providers.  Prior to Public Act 350, Old BCBSM's rates with hospitals

were regulated by the state but its rates with other healthcare providers were not.  Under Public

Act 350, the rates Old BCBSM paid to other healthcare providers became subject to downward

price regulation.  Pursuant to Public Act 350, Old BCBSM was directed to implement provider

class plans governing how providers would be compensated across the state.  Each plan was

---

[31] Hollister & Drake, *supra*, at 447.

[32] *Id.* at 449.

subject to approval by state regulators, and Providers that wished to serve Old BCBSM members would have to abide by whatever plan applied to them.

79.     A key aspect of the provider class plan system was that it put a ceiling on the rates Old BCBSM could pay providers.  The cap was calculated based on "the compound rate of inflation and real economic growth," without regard to what the competitive rates among private insurers would be for those services.  *Michigan Physical Therapy Ass'n, Inc. v. Comm'r of Ins.*, No. 230016, 2003 WL 1919966, at *4 (Mich. Ct. App. Apr. 22, 2003).  As one court explained, the goal of Public Act 350 was to "decrease[] BCBSM's costs," and "'fairness' to providers of health care services" was not a "concern" of the statute.  *Id.* at *5-6.

80.     This price regulation rendered Public Act 350 "similar to acts governing public utilities," thereby increasing Old BCBSM's state-sanctioned dominance in the market.  *In re 1987-88 Med. Dr. Provider Class Plan*, 203 Mich. App. 707, 728 (1994).  An article contemporary with Public Act 350 observed: "Blue Cross/Blue Shield of Michigan is the only corporation to which the Legislature has granted the privilege and authority to contract directly with providers of health care."[33]

81.     Public Act 350 also prevented Old BCBSM from having to compete in its niche with Blue Cross and Blue Shield entities from other states.  Under Public Act 350, Old BCBSM's special privileges were limited to entities that had been approved by Michigan to operate as healthcare corporations.  That act barred non-residents from organizing healthcare corporations, thus preventing Blue Cross and Blue Shield entities in other states from entering the Michigan market to compete with Old BCBSM.  *See* MCL § 550.1201 (providing that not "less than 7 persons, all of whom shall be residents of this state, may form a health care

---

[33] Hollister & Drake, *supra*, at 442.

corporation under this act"); *see id.* ("A person shall not act as a health care corporation or issue a certificate except as authorized by . . . and pursuant to this act."); *see also* MCL § 550.1218 (forbidding "a change in direct or indirect control of the health care corporation" except as permitted by Public Act 350). Therefore, even if other Blue entities had wanted to compete with Old BCBSM by establishing healthcare corporations in Michigan, state law precluded such competition.

82.     Just as Public Act 350 kept out Blues from other states, it also imposed regulatory barriers on Old BCBSM from competing outside Michigan. Under that law, Old BCBSM could not "*purchase, take, receive*, subscribe for, *or otherwise acquire, own, hold*, vote, employ, sell, lend, lease, exchange, transfer, or otherwise dispose of bonds or other obligations*, shares, or other securities or interests issued by a domestic, foreign, or alien insurer*," unless stringent requirements were met, including approval from Michigan's attorney general. MCL § 550.1207 (emphasis added). That approval, in turn, required a finding that Old BCBSM's ownership of another insurer was "in the best interests of the health care corporation *and its subscribers*." *Id.* (emphasis added). Moreover, Old BCBSM could "only transact business . . . for the benefit of the subscribers of the corporation as a whole, and consistent with this act," *i.e.*, Old BCBSM's business practices had to serve the healthcare needs of Michigan residents. *Id.* § 550.1206.

83.     This comprehensive legislative regime built around Old BCBSM led to a healthcare system that, as the Michigan Supreme Court correctly concluded, "does not, and has not, operated as a competitive market." *Blue Cross & Blue Shield of Michigan v. Milliken*, 422 Mich. 1, 41 (1985). Old BCBSM was insulated from competition from both inside and outside of Michigan. It was the sole healthcare corporation in Michigan, and this unique status provided it with monopsony power over health care providers generally. So powerful was Old BCBSM

that it controlled more than just prices; it "dictated health policy in the state."[34]  As Old BCBSM was, by law, not an insurer, it occupied its own market for purchasing healthcare services, a market in which it was the only participant.  That market power derived from the regulatory regime surrounding Old BCBSM.  Then-governor Rick Snyder explained in a January 24, 2014 report to the Center for Medicare and Medicaid Innovation that "Blue Cross Blue Shield of Michigan's dominance of the commercial market was established with explicit support from the State."

84.    This dominance included control over the prices paid to anesthesiologists.  Prior to the legislative changes in 2013, anesthesiologists in Michigan had no practical choice but to work with Old BCBSM at the rates Old BCBSM provided.  Old BCBSM's monopsony power over anesthesiologists during this period derived from at least three aspects of Old BCBSM's regulatory status.  First, under Public Act 350, the rates Old BCBSM could pay under its Provider Class Plans were subject to the ceiling imposed by the act, thus insulating Old BCBSM from market forces.

85.    Second, Old BCBSM's market power in providing healthcare coverage, which derived from Old BCBSM's enabling legislation, meant that anesthesiologists who did not work with Old BCBSM would be cut off from serving most insureds in Michigan.  Thus, anesthesiologists that wanted to serve Michigan consumers had no choice but to work with Old BCBSM.

86.    Third, and separately, Old BCBSM had monopsony power over anesthesiologists due to Old BCBSM's market power in the market for purchasing hospital services.  Old BCBSM's authority to dictate terms to Michigan hospitals extended back to its predecessor, Blue

---

[34] Hollister & Drake, *supra*, at 433.

Cross of Michigan, which used "the Blue Cross dominance in the health insurance market to ensure that no more hospitals would be built without their approval."[35]

87.    Old BCBSM's power over Michigan hospitals continued for decades thereafter, including through its practice of imposing most-favored nation ("MFN") clauses on hospitals. Under these MFN clauses, hospitals agreed to charge private insurers as much as, or more, than the hospitals charged Old BCBSM.  By the early 2000s, Old BCBSM had such agreements with over half the hospitals in Michigan.  These MFN agreements were outlawed by Michigan's 2013 legislation.

88.    Old BCBSM's power over Michigan hospitals meant that Old BCBSM had negotiating power over anesthesiologists.  As explained above, anesthesiologists require access to hospitals to serve customers.  Old BCBSM dominant position over Michigan hospitals meant that it could effectively dictate to hospitals not to work with certain anesthesiologists, thus giving Old BCBSM gatekeeping power over which anesthesiologists could work in Michigan.  As a result, anesthesiologists that wished to practice in Michigan had no choice but to work with Old BCBSM at the rates dictated by Old BCBSM.

89.    In sum, for the period from at least the implementation of Public Act 350, and into 2013, there were two separate markets for purchasing anesthesiology services in Michigan. One was a market of private insurers competing to purchase anesthesiology services.  The other was a market of Old BCBSM, the state's only healthcare corporation, purchasing anesthesiology services.

---

[35] Sallyanne Payton & Rhoda M. Pownser, *Regulation Through the Looking Glass: Hospitals, Blue Cross, and Certificate-of-Need*, 79 Mich. L. Rev. 203, 240 (1980).

**B.    In 2013, the Michigan Legislature Overhauled Michigan's Healthcare Markets to Eliminate Old BCBSM's Dominance.**

90.    Michigan's regulated-utility model of healthcare coverage led to complaints, including about Old BCBSM's "unresponsiveness to consumer interests," *Blue Cross & Blue Shield of Michigan v. Milliken*, 422 Mich. 1, 16 (1985); at times these criticisms reached the level of "public outrage."[36]  A presentation to the Michigan legislature in or around 2012 complained, "PA 350 of 1980 is outdated and creates an unlevel playing field for insurers."  By this time, the lack of competition in Michigan's healthcare industry had become increasingly difficult to justify.  For example, in 2010, one of the statutory missions of Old BCBSM was rendered obsolete.  Old BCBSM had been tasked with providing healthcare coverage to persons who would be turned down by private insurers, but in 2010 Congress passed the Affordable Care Act, which required private health insurers generally to insure consumers regardless of pre-existing conditions.  This significant change in the healthcare markets meant that Michigan no longer needed a dedicated healthcare coverage provider of last resort.

91.    In 2013, the Michigan legislature enacted a pair of laws, Senate Bills 61 and 62, intended to modernize Michigan's outdated healthcare system and open it to competition on an even playing field.  The laws provided for the establishment of a new type of insurer, a non-profit mutual insurer that would be governed under the same rules as other private insurers, without Old BCBSM's statutory privileges and regulations, and without the special rate regulation that applied to Old BCBSM.  On September 6, 2013, BCBSM was formed pursuant to this new legislation.  Thus, for the first time in Michigan's history, a Blue Cross Blue Shield

---

[36] Payton & Pownser, *supra*, at 244 (explaining that Old BCBSM's predecessor "Blue Cross was particularly vulnerable to public outrage because it was the creature of state enabling legislation"); *see also* Hollister & Drake, *supra*, at 447.

entity would be competing on an even playing field with other insurers in Michigan. Moreover, because BCBSM was not a healthcare corporation, it was not insulated from competition with the other Blues by Public Act 350 and its stringent residency requirements, and it was not subject to Public Act 350's restrictions on owning or acquiring insurers-out-of-state. This again marked a first in decades: the Michigan legislature had subjected Michigan's domestic Blue insurer to competition by Blue insurers from other states and vice-versa.

92.     The 2013 laws also provided for the dissolution of Old BCBSM. The 2013 legislation permitted Old BCBSM to merge into BCBSM. That merger took effect on December 31, 2013. Per the 2013 legislation, that merger marked the "*dissolution of the nonprofit healthcare corporation*," Old BCBSM. MCL § 550.1220 (emphasis added). Per that law, BCBSM was empowered to "close the affairs of the merged health care corporation." *Id.* Unlike Michigan's merger statute for corporations generally, the statute governing Old BCBSM's merger did not include a provision for BCBSM to retain "the title to all real estate and other property and rights owned by" Old BCBSM following the merger. MCL § 450.1724.

93.     The dissolution of Old BCBSM also meant the end of Old BCBSM's licensing arrangement with the BCBSA and any related agreements Old BCBSM had with other Blues. The BCBSA owns the Blue Cross and Blue Shield branding and is in turn owned and controlled by the Blues. Prior to the merger, Old BCBSM had agreed with the BCBSA to license the BCBSA's Blue branding. That arrangements did not survive the merger. For example, Old BCBSM entered into a Blue Cross License Agreement with the BCBSA on or around January 1, 1991. The agreement provides that the "license hereby granted to Plan," Old BCBSM, "to use the licensed Marks and the Licensed Name is and shall be personal to the Plan so licensed and shall not be assignable by any act of the Plan, directly or indirectly" and "shall not be assignable

37

by operation of law." The agreement further provides that it will terminate upon any "voluntary action seeking a reorganization" by Old BCBSM. Old BCBSM's licensing arrangement with the BCBSA ended on or before Old BCBSM's dissolution on December 31, 2013.

    **C.**    **Starting in 2014, BCBSM Conspires to Reduce Competition in Michigan's Reshaped Healthcare Markets.**

    94.    The dissolution of Old BCBSM marked a new era of open competition in Michigan's healthcare markets, but that era was short-lived. A day after Old BCBSM was dissolved, BCBSM entered into its own arrangement with the BCBSA and the other Blues.

    95.    On January 1, 2014, BCBSM entered into a licensing agreements with the BCBSA to use the Blue Cross and Blue Shield trademarks, a fact that has previously been stipulated to by BCBSM.[37] These licenses were entered into on behalf of the new entity "Blue Cross Blue Shield of Michigan Mutual Insurance Company." BCBSM, and the other Blues across the country, subsequently entered into modified license agreements with the BCBSA, dated as of November 18, 2016, again a fact stipulated to by BCBSM.[38]

    96.    With these agreements, BCBSM conspired horizontally with other Blues nationwide to suppress competition, thereby allowing BCBSM to monopsonize the markets for buying healthcare provider services in Michigan (including hospital services and anesthesiology services), markets that Michigan had just opened to competition in 2013.

    97.    For example, BCBSM through the 2014 and 2016 agreements, agreed with the other Blues to allocate geographic markets, referred to as "services areas," among the Blues, pursuant to which BCBSM will refrain, with limited exceptions, from competing in other Blues'

---

[37] *See* Defendants' Stipulation as to the Authentication and Admissibility of Certain License Arrangements, No. 13-cv-20000-RDP, ECF 1272, at 3.

[38] *Id.* at 1.

services areas and those Blues will refrain from competing in Michigan. The agreements also curtailed competition involving BCBSM's and other Blues' non-Blue affiliates.

98.    In entering into the 2014 and 2016 agreements, BCBSM agreed to restrictions on (i) how much revenue a Blue can generate from non-Blue business in its designated service area and (ii) how much revenue a Blue can generate company-wide through businesses other than its Blue-branded business. Under these so-called "Best Efforts" rules, BCBSM agreed to limit the revenue it derived from its non-Blue businesses. These limits, which constituted output restrictions on non-Blue revenues, ensured that Blues would not circumvent the service area allocations by competing with each other using non-Blue subsidiaries.

99.    BCBSM's anti-competitive agreements result in BCBSM enjoying less competition in Michigan both for selling commercial health insurance and for signing providers up to its network. In exchange, BCBSM restricts its competition with the other Blues in their service areas. By restraining competition with the other Blues and their affiliates, BCBSM is able to pay providers less than it otherwise would have: lowering its costs and increasing its control of the Michigan commercial health insurance market. These restrictions have no pro-competitive justification, and instead serve to protect BCBSM from the normal market forces that drive competition and innovation, while harming competing health insurers, healthcare providers, and consumers.

100.    Other Blues would compete with BCBSM, and vice versa, under normal market conditions. For example, Blue Cross Blue Shield of Wisconsin ("BCBS-WISC") provides health insurance plans in Wisconsin to approximately 900,000 enrollees in Wisconsin, either directly or through subsidiaries. As another example, Blue Cross Blue Shield of Ohio ("BCBS-OH") provides health insurance plans in Ohio to more than 3,000,000 enrollees, either directly or

through subsidiaries.  While these entities, as non-residents, had been shut out from creating competing healthcare corporations under Public Act 350, Michigan's 2013 legislation omitted this stringent residency requirement.  As a result, under Michigan law, out-of-state Blues entities could participate in creating entities to compete directly with BCBSM.

101.    But for BCBSM's anticompetitive agreements in 2014 and thereafter, BCBS-WISC, BCBS-OH, or both would likely offer health care products in neighboring Michigan, thereby exerting competitive pressures against both BCBSM's monopsony and monopoly power. However, the geographic and output restrictions in the "amended license agreement" allow BCBSM to insulate itself from the normal forces of competition, thereby allowing BCBSM to keep premiums up and provider reimbursements down.

102.    By entering into the license agreements, BCBSM also agreed with the other Blues to fix prices and boycott healthcare providers outside their service areas.  Per this "BlueCard" agreement, BCBSM will process claims by a provider in its service area on behalf of a patient covered by another Blue plan, and vice versa.  For example, if A4 in Michigan treats someone covered by a Blue plan in another state, A4 must submit its claim to BCBSM after which the claim is transmitted to the patient's Blue plan for processing.  A4 is paid based on its reimbursement rate with BCBSM—thereby fixing prices between BCBSM and the other Blues—but has to comply with the medical policy and other requirements of the other plan.

103.    A4 is therefore expected to comply with myriad different variations of medical policies, creating inefficiencies, adding to administrative costs and resulting in claim denials, in whole or part based upon the lack of information available about the various other Blue plans.

104.    Pursuant to its license agreements, BCBSM has also agreed not to contract with providers outside of Michigan, in exchange for other Blues not contracting with providers in

Michigan.  This boycott means that A4's only option for providing services in Michigan to

patients insured under other Blues is to do so through BCBSM pursuant to BlueCard.  A4 has

been forced to accept BCBSM's anesthesiology rate when it covers patients insured by any of

the Blues, regardless of what those insurers' rates are.  This price fixing in turn keeps the

anesthesiology rates in Michigan artificially suppressed.

105.    For example, in 2020, Blue Cross Blue Shield of Florida used conversion rates of

around $70 - $80, significantly higher than BCBSM's $63.76 conversion rate in 2020.  However,

when A4 treated patients insured by Blue Cross Blue Shield of Florida in 2020, it had to accept

BCBSM's lower rate.

106.    There is no pro-competitive justification for BCBSM's conspiracy with the other

Blues.  These horizontal conspiracies restrain competition, restrict output, fix prices, and boycott

services providers, thereby restraining trade in the very healthcare markets that Michigan

liberalized in 2013.  BCBSM's conspiracy increases BCBSM's market power in Michigan,

enabling BCBSM to pay anesthesiologists less than what BCBSM would have paid absent these

violations of the antitrust laws.

**IV.    BCBSM Has Used its Illegally Acquired and Illegally Maintained Monopsony
Power to Reduce the Quantity and Quality of Anesthesiologists in Michigan,
While Maintaining or Increasing Prices to Consumers.**

107.    Since conspiring with the other Blues in 2014, BCBSM has used that conspiracy

to acquire monopsony power in the market for purchasing anesthesiology services in Michigan.

108.    In a BCBSM "Network Update," dated July 10, 2019, BCBSM emphasized that

an attempt by A4 to leave BCBSM's network set A4 "apart from other anesthesiology practices

in Michigan which <u>all</u> accept the current uniform Blue Cross contracted payment as payment in

full."  (emphasis in original.)  (Because of BCBSM's anticompetitive conduct, A4 ultimately had

no choice but to remain in BCBSM's network.)  Pursuant to BCBSM's uniform anesthesiology

rate, the least-qualified and most inexperienced anesthesiologist, working in the lowest cost part

of the state, is compensated using the same conversion factor as the most sought-after and

highly-trained anesthesiologists in the most expensive parts of the state.

109.    Unlike BCBSM, its competitors negotiate conversion factors with

anesthesiologists to reflect differences in cost and quality of care.  Even Medicare, by contrast,

has two different conversion factors for Michigan: one for the Detroit area and one for the rest of

Michigan.

110.    Monopsony power is the ability of a buyer to reduce prices while also reducing

the overall amount purchased in a market.  BCBSM's actions demonstrate both of these

hallmarks of monopsony power.

**A.      BCBSM Has Set Its Uniform Price for Anesthesiology Services at a Below-Competitive Level.**

111.    BCBSM has set its uniform price for anesthesiology services at a level that is

below-competitive.  In 2018, BCBSM applied a statewide conversion rate of $58.65.  That is

over $17 less than the national average anesthesiology conversion rate in 2018 of $76.32.[39]  In

percentage terms, BCBSM's 2018 conversion factor was over 23% lower than the 2018 national

average.

112.    BCBSM's 2018 conversion factor is also significantly below the 2018 median

national anesthesiology conversion factor of $71.81.[40]  BCBSM's conversion factor was so low

that it was in the 25th percentile nationwide according to the American Society of

Anesthesiologists 2018 data.[41]  Put differently, 75% of the commercial conversion factors for

---

[39] ASA Survey at 73.

[40] Id.

[41] Id.

anesthesiology in 2018 across the country were higher than BCBSM's conversion factor.  In what the American Society of Anesthesiologists classifies as the Eastern Midwest region (Michigan, Illinois, Indiana, Kentucky, and Ohio), BCBSM's 2018 rate was also in the 25th percentile, *i.e.* 75% of the commercial conversion factors for anesthesiology in the region were higher than BCBSM's conversion factor.[42]

113.    In a September 2020 internal memorandum, BCBSM acknowledged that Michigan specialists, including anesthesiologists, would suffer "***losses***," absent higher reimbursements from BCBSM.  (Emphasis added.)

114.    BCBSM's low conversion factor cannot be explained by differences in the cost of care.  If BCBSM's low conversion factor merely reflected differences in the cost of care between Michigan and the rest of the country, then one would expect Medicare's conversion factors for Michigan, which also take into account the cost of care, to be significantly lower than Medicare rates for the rest of the country.  That is not the case.

115.    Instead, anesthesiologists in the Detroit area (including Macomb, Oakland, Washtenaw, and Wayne counties) had a 2020 Medicare conversion factor of $23.07, one of the highest Medicare conversion factors in the country, ranking approximately 28th out of over 100 localities, placing it in approximately the upper 75th percentile of Medicare conversion factors.  BCBSM's low rate thus cannot be explained by cost of care.  To the contrary, BCBSM imposes a low conversion rate where A4 operates, despite the high cost of care there.  It is also notable that Medicare has two different conversion factors in Michigan, while BCBSM only has a single factor for the entire state.  In an efficient market, one would expect there to be more price differentiation by commercial insurers than public insurers, not less.

---

[42] *Id.* at 74, 79.

116.    BCBSM's conversion factor is also much lower than one would expect it to be given the applicable Medicare conversion factors.  According to the American Society of Anesthesiologists in 2018, commercial conversion factors nationwide were on average about three and one-third times the applicable Medicare conversion factors.[43]  Using that multiplier would mean that, based on Michigan's Medicare rates, the commercial conversion factor for the Detroit area should be about $79.56 and the conversion rate for the rest of Michigan should be about $75.29.  However, as of 2020, BCBSM's statewide rate was $63.76, significantly lower than commercial rates one would expect based on Michigan's Medicare rates for anesthesiology.

117.    BCBSM's conversion factor has also been much lower than the average and median factors in Ohio.  Ohio and Michigan are similarly-sized Midwestern states located on the Great Lakes and with an industrial focus.  Both have populations with an average age of around forty years old.  One would expect similar conversion factors for anesthesiology.  However, the average conversion factor in 2018 in Ohio was $69.16, over ten dollars higher than BCBSM's $58.65.[44]  In 2021, BCBSM's conversion factor remained one of the lowest in the nation.

118.    Because BCBSM is, in the words of one competing health insurer, "driving the market price for anesthesia in Michigan," BCBSM's low conversion factor results in Michigan overall having some of the lowest pay for anesthesiologists in the nation.  Bureau of Labor Statistics data from 2019 shows that the "[a]nnual mean wage" for anesthesiologists in Michigan is in the *lowest band nationally* (out of four bands) and *is lower than every surrounding or*

---

[43] ASA Survey at 72.

[44] *Id.* at 79.

*nearby state for which there is data available: Wisconsin, Illinois, Indiana, Pennsylvania, Kentucky, West Virginia, and Missouri* (data for Ohio was not available).[45]

119.    BCBSM's monopsony power has reduced not just in-network pricing for anesthesiology services; it has also reduced out-of-network pricing as well.  When an anesthesiologist is in-network, the question of what conversion factor will be charged is typically subject to the anesthesiologist's contract with the patient's insurer.  When a doctor is out-of-network with an insurance company, he or she does not have a pre-existing agreement on rates with the insurance company, and instead each bill is determined either by negotiation (which may lead to litigation) or by applicable laws governing anesthesiologist compensation on a case-by-case basis.

120.    In 2020, Michigan adopted legislation mandating in some circumstances that anesthesiologists not balance bill patients.  In 2021, federal regulators promulgated balance-billing regulations at the federal level.  These laws and rules also regulate how much anesthesiologists can bill out-of-network insurers in certain instances.  Because in-network rates are an input into these calculations, BCBSM's efforts, since January 1, 2014, to suppress competition and in-network rates mean that out-of-network rates are also being suppressed.

### B.    BCBSM Is Reducing the Quantity and Quality of Anesthesiology Care in Michigan.

121.    This reduction in demand in turn results in a reduction in the quantity and quality of anesthesiology care in Michigan.  In April 27, 2021, it was reported in the *Lansing State Journal* that "nearly 100 anesthesiologist positions are open across Michigan right now and experts expect this shortage to continue," with BCBSM's low reimbursement rate listed as the

---

[45] *Occupational Employment and Wages, May 2019 29-1211 Anesthesiologists*, Bureau of Labor Stats. (May 2019), https://www.bls.gov/oes/current/oes291211.htm.

primary cause.[46]  Despite the glut of unfilled anesthesiologist positions, as of 2021, "[m]ore than half of all anesthesiologists trained at the University of Michigan are leaving our state,"[47] an outflow rate that is higher than other parts of the country.  As a result, "Michigan hospitals are being forced to shut down operating rooms due to a shortage of anesthesiologists,"[48] leaving patients to have to find treatment elsewhere, during which time their conditions may worsen. Thus, while patients, and in turn hospitals, need more anesthesiologists to provide critical, high-quality care, BCBSM's conspiracy has reduced demand among insurers for anesthesiology to the point where there are not sufficient doctors in the state to serve patients.

122.    Given the ongoing shortage of anesthesiologists in the state, and BCBSM's below-competitive reimbursement, anesthesiologists are being pushed to work longer hours and to oversee more anesthetizing locations concurrently than in years past.  A decade ago, anesthesiologists in many hospitals in Michigan regularly worked at a 3-to-1 or lower staffing ratio.  That ratio has increased due to BCBSM's continued exploitation of its illegal market power, such that anesthesiologists in many hospitals in Michigan have had to work at a 4-to-1 staffing ratio, meaning that they are responsible for providing medical direction for CRNAs in four different anesthetizing locations concurrently.  With fewer anesthesiologists available, those remaining in Michigan are being tasked with handling more cases concurrently.

123.    A4 is on the frontlines of the anticompetitive effects caused by BCBSM's actions. A4 is one of the dwindling number of independent anesthesiology groups in Michigan focusing

---

[46] Rick Ganzi, *Michigan is Facing an Anesthesiologists Shortage, Due to Minimal Reimbursement*, Lansing State Journal (Apr. 27, 2021), https://www.lansingstatejournal.com/story/opinion/contributors/viewpoints/2021/0 4/27/gap-reimbursement-rates-anesthesiologists-hurts-health-care/7201393002/.

[47] *Id.*

[48] *Id.*

on delivering high-quality care.  But as a result of BCBSM's anticompetitive actions, A4 has lost multiple doctors who have decided to cease practicing in Michigan.  Since 2014, A4 has lost multiple doctors who left to practice in Toledo, Ohio about an hour's drive south of Ann Arbor, Michigan.  As discussed above, Ohio's average conversion factor for anesthesiology, in 2018 for example, was about $10 higher than BCBSM's.  Because of how anesthesiology billing is calculated using 15-minute units, a $10 difference in conversion factor can result in around a *$40 per hour* or more difference in compensation.

124.     Nor is A4 the only anesthesiology group in Michigan suffering from BCBSM's anticompetitive actions.  In Fall 2020, BCBSM had a call with the Michigan Society of Anesthesiologists, with representatives from multiple anesthesiology groups in Michigan joining.  On the call, those anesthesiology groups confirmed that BCBSM's rate was causing anesthesiologists to leave the state; hampering efforts to recruit anesthesiologists into Michigan; and forcing the remaining doctors to work longer hours and at higher staffing-ratios.  The anesthesiology groups also made clear that the costs to anesthesiologists of delivering anesthesiology care had been increasing faster than BCBSM's rate (which had remained effectively the same for multiple years), thus leading to a practical reduction in BCBSM's rate over time.  At the meeting BCBSM admitted that its anesthesiology rate was low and needed to be increased.

125.     Just as the overall amount of anesthesiology services in the state has been reduced by BCBSM's actions, A4 itself has had to curtail where it works and the amount of services it provides because of BCBSM's monopsonist practices.  After several years of practicing successfully at Beaumont, it had to cease working there due to BCBSM's actions.  Shortly thereafter, Beaumont cut ties with another respected anesthesiology group, NAPA, as well, in a

decision that was likewise animated by BCBSM's monopsonistic practices in the market for purchasing anesthesiology services.

126.    Prior to losing A4 and NAPA, Beaumont's hospitals were highly regarded.  A4 and Beaumont had a successful relationship, which included improvements that A4 brought to the Beaumont Dearborn cardiac surgery department.  This success derived in part from the working relationship developed between Beaumont's cardiac surgeons and A4's cardiac anesthesiologists.  Likewise, Beaumont's Royal Oak hospital, where NAPA served patients, had a cardiovascular surgery practice that ranked among the top 50 in the country.

127.    However, after BCBSM's actions led to the loss of A4 and NAPA, Beaumont was not able to hire the number and quality of replacement anesthesiologists to continue operating at the same level of care.  After Beaumont ceased working with A4 and NAPA, cardiologists at Beaumont expressed "serious concerns that Northstar," a new anesthesiology provider at Beaumont, "will not be able to provide the quality of cardiac anesthesia services that we have received for several decades."[49]  Amidst complaints of an anesthesiologist showing up 45-minutes late for surgery and refusing to work on weekends, a majority of Beaumont's surgeons declared that they lack confidence in Beaumont's leadership.[50]  Beaumont is also reported to have lost possibly "close[] to 50%" of its anesthesiologists at one hospital.[51]  The reduction in

---

[49] Karen S. Sibert, *How Could a Patient Die from Anesthesia for a Colonoscopy?*, MedPage Today (Feb. 4, 2021), https://www.kevinmd.com/blog/2021/02/how-could-a-patient-die-from-anesthesia-for-a-colonoscopy.html.

[50] Eric Starkman, *Starkman: Beaumont Cardiac Leaders Warn Hospital Chairman of Compromised Patient Care*, Deadline Detroit (Sept. 18, 2020), https://www.deadlinedetroit.com/articles/26232/starkman_beaumont_cardiac_leaders_warn_hospital_chairman_of_compromised_patient_care.

[51] Eric Starkman, *Beaumont Health's Culture of Deceit and Intimidation Imperils Patient Safety*, Deadline Detroit (Jan. 29, 2021),

the quality of anesthesiology services available at Beaumont affects *all of Beaumont's* patients,

regardless of whether they are insured by BCBSM or some other insurer.

128.    Given these issues, Beaumont surgeons increasingly performed operations at

Trinity's Oakland hospital instead—where A4 still works—despite the potential additional cost

and inconvenience to patients.

C.    **BCBSM Has Increased the Quality-Adjusted Prices Paid by Consumers for Health Insurance and for Anesthesiology Care.**

129.    As a monopsonist, BCBSM does not pass on the savings from its below-

competitive purchasing price to consumers.  It has no need to do so.  While BCBSM's

anticompetitive rate has reduced the quantity and quality of anesthesiology services offered in

Michigan, that reduction applies to BCBSM's competitors too.  BCBSM is therefore able to

reduce the quality of its insurance coverage while maintaining its dominance vis-à-vis

competitors in selling insurance, and can thus avoid lowering its prices.  By reducing the quality

and quantity of the anesthesiology coverage it offers, without reducing rates commensurately,

BCBSM has increased quality-adjusted prices for health insurance and for anesthesiology care.

130.    BCBSM possesses monopoly power in the market for selling health insurance,

due to its efforts from 2014 onward to reduce competition in Michigan.  BCBSM therefore has

been able to increase prices despite reducing the quality of the product it offers.  BCBSM

dominates, by any measure, the commercial healthcare market in Michigan.  In 2019, BCBSM's

market share was 67%.[52]  By 2021, that market share increased to 68%, while the next largest

---

https://www.deadlinedetroit.com/articles/27237/starkman_beaumont_health_s_culture_of_deceit
_and_intimidation_imperils_patient_safety.

[52] *Competition in Health Insurance: A comprehensive study of U.S. markets*, Am. Med. Ass'n 14 (2019).

commercial health insurer in Michigan, Spectrum Health had only 10% of the market.[53]  As of

2021, BCBSM also had a 78% of the market for preferred provider organization ("PPO")

insurance plans.[54]  According to the Michigan Association of Health Plans, BCBSM has a 77%

share of employer provided commercial health insurance in Michigan.  In total, Michigan's

commercial health insurance market is the *second-least competitive* in the United States, having

fallen four places since 2018, when Michigan was only the sixth-least competitive.[55]

131.    BCBSM's dominance is reflected in the heavy concentration in the commercial

health insurance market in Michigan.  Under the Herfindahl–Hirschman Index ("HHI"), which

the U.S. Department of Justice employs to measure market concentration, Michigan's

commercial insurance market as of 2021 had a score of 4,648.[56]  HHI increases as competition

goes down, and Michigan's 4,648 score is *almost double* the 2,500 point threshold at which

markets are deemed highly concentrated.[57]

132.    As a monopolist in the market for selling health insurance to Michigan

consumers, BCBSM can, and has, raised prices for consumers even as it reduces the quality of

the product if offers.  For example, BCBSM raised its rates by at least 2.5% for 2021, and

---

[53] *Competition in Health Insurance: A comprehensive study of U.S. markets*, Am. Med. Ass'n 17 (2021).

[54] *Id.* at 28.

[55] *Compare States with the Least Competitive Commercial Health Insurance Markets*, Am. Medical Assoc. at 1 (2020), https://www.ama-assn.org/system/files/competition-in-health-insurance-commercial-markets.pdf, *with Ten States with Least Competitive Health Insurance Markets*, Am. Med. Assoc. at 1 (Sept. 17, 2019). https://www.ama-assn.org/delivering-care/patient-support-advocacy/10-states-least-competitive-health-insurance-markets.

[56] *Competition in Health Insurance: A comprehensive study of U.S. markets*, Am. Med. Ass'n 17 (2021).

[57] *See Herfindahl-Hirschman Index,* Dep't of Justice (July 31, 2018), https://www.justice.gov/atr/herfindahl-hirschman-index.

BCBSM is seeking increases ranging from 7.5% to 11.5% for its plans in 2025, according to Michigan's Department of Insurance and Financial Services.  BCBSM's actions have thus increased both the nominal and the quality-adjusted prices for consumers.

133.    Because BCBSM's anticompetitive acts have resulted in BCBSM underpaying anesthesiologists and overcharging consumers, barring those actions would benefit both consumers and anesthesiologists.  But for BCBSM's anticompetitive acts, Michigan consumers would have an increase in the quality and quantity of anesthesiology services available and a decrease in the quality-adjusted price of anesthesiology care, while anesthesiologists would benefit from competitive rates.  Consumers who prefer lower-cost anesthesiology providers regardless of quality would still have the option to do so, because instead of being paid a uniform rate, anesthesiologists would compete at different price levels.  Because of BCBSM's anticompetitive schemes, high-quality providers are being driven out of the state, despite consumer demand for their services.  Enjoining BCBSM's anticompetitive actions would lead to more high-quality providers being available to meet patients' needs.

**V.    BCBSM Has Acquired Market Power in Each of the Relevant Markets.**

134.    BCBSM's anticompetitive conduct spans multiple product markets.  Because BCBSM's anticompetitive conduct involves both monopoly and monopsony, the markets affected include both a market of competing sellers and a market of competing buyers.  Each of these markets changed significantly due to the passage of the federal Affordable Care Act in 2010 and Michigan Senate Bills 61 and 62 in 2013.  These legislative changes led to the end of Old BCBSM's state-sanctioned dominance in Michigan's healthcare industry and opened that industry to competition—competition which BCBSM then proceeded to suppress.

135.    First, there is the market for the sale of commercial healthcare insurance (excluding Medicare and Medicaid programs).  This is a market of sellers competing for buyers:

51

specifically, health insurers competing to provide health insurance services to individuals or enterprises. This product market includes the various means of paying or reimbursing for healthcare goods and services other than the direct payment by individuals who are not insured or indemnified. This market includes the sale of the full package of healthcare financing services, including insurance, as well as, for self-insured groups, the sale of other healthcare financing services, such as access to a network of healthcare providers at reduced prices and the administration of healthcare-related employee benefit plans, which together form a relevant product market. This relevant product market can be described as the market for the sale of commercial health insurance.

136.    The purchasers of commercial health insurance do not have reasonable alternatives. Some employers are required by the Affordable Care Act to offer healthcare benefits to their employees. Employers who are required to offer these benefits, as well as employers who are not required to offer these benefits but wish to do so, have no reasonable alternative but to purchase commercial health insurance. For these employers, forgoing coverage or trying to self-supply, in other words managing all aspects of their employees' health benefits on their own, is not feasible. Therefore, a profit maximizing hypothetical monopolist in this market likely would raise prices above competitive levels by imposing at least a small but significant and non-transitory increase in price.

137.    Second is the market of commercial health insurers, but not Medicare or Medicaid, competing to buy anesthesiology services in Michigan. This is a market of buyers competing for sellers: specifically, health insurers competing to purchase anesthesiologist services. For providers of anesthesiology services there is no reasonable alternative to accepting payments from commercial health insurers. Because Medicare and Medicaid use conversion

factors that are essentially below cost, an anesthesiology provider cannot limit his or her practice to those public payers.  Likewise, an anesthesiologist generally cannot rely solely on out-of-pocket payments by patients.

138.    For each of these product markets, the relevant geographic market is no larger than the state of Michigan.  Michigan does not accept the medical licenses of other states and vice versa.  Therefore, a Michigan anesthesiologist is limited to practicing in Michigan unless he or she becomes licensed in another state.  Even if a Michigan anesthesiologist were licensed in a neighboring state, the long hours associated with anesthesiology practice (often 60 hours a week) limit the amount of time an anesthesiologist can spend commuting.  So while some Michigan anesthesiologists close to the Ohio border can and do travel to Ohio to take advantage of the higher conversion rates in that state, commuting is not an option generally available to Michigan anesthesiologists.  Services provided at hospitals, including anesthesiology services, are also, by their nature, primarily local, as people tend to visit hospitals close to where they live and work.

139.    In the alternative, there may be smaller geographic markets within Michigan where the competitive harms from BCBSM's actions are even more severe.

140.    Whether assessed across Michigan or at a smaller level, where appropriate, BCBSM possesses market power in the product markets for purchasing anesthesiology services and for selling health insurance.  As discussed above, BCBSM has monopoly power as a seller of health insurance and monopsony power as a buyer of anesthesiology services.

141.    A4 reserves the right to further refine its definitions of the relevant product markets and relevant geographic markets as more data and expert analysis become available.

## VI.   There is No Pro-Competitive Benefit Outweighing the Harms of BCBSM's Anticompetitive Conduct.

142.    As discussed above, BCBSM's anticompetitive conduct, on or after January 1, 2014, has reduced competition among commercial insurers in Michigan, reduced the quality and quantity of anesthesiology care in Michigan to levels below those needed by consumers, and forced consumers to pay higher quality-adjusted prices.  In contrast to these multiple market harms, BCBSM's conduct has no pro-competitive benefits.

143.    BCBSM cannot claim that its anti-competitive conduct has resulted in lower costs for consumers.  BCBSM has used its monopsony and monopoly power to create a surplus for itself at the expense of consumers and anesthesiologists.  BCBSM paid its chief executive officer over $19 million in compensation in 2018, more than any other Blue, and more than almost every other insurance company, healthcare or otherwise, for-profit or non-profit.  BCBSM's actions have instead increased costs to consumers by increasing quality-adjusted prices. Additionally, because BCBSM has maintained or increased premiums through its monopoly power, eliminating BCBSM's anticompetitive actions could lead to both decreased quality-adjusted prices and decreased nominal prices for consumers, even as the conversion rate for high-quality anesthesiology services increases to competitive levels.

## VII.   A4 Has Suffered Damages from BCBSM's Antitrust Violations.

144.    A4 has suffered significant and ongoing damages caused by BCBSM's anticompetitive misconduct.

145.    A4 has been paid less for anesthesiology services than it would have received absent BCBSM's violation of the antitrust laws.  But for BCBSM's anticompetitive conduct, A4 would be able to negotiate higher reimbursement rates for anesthesiology services from BCBSM. Even if A4 were working outside of BCBSM's network, it would be receiving higher payments

from BCBSM but for BCBSM's anticompetitive acts, as those actions have pushed down the historic (and current) median price for in-network anesthesiology services at BCBSM, and under state and federal law, that median price is generally how out-of-network payments are calculated. BCBSM's anticompetitive conduct has also shut out A4 from working with Trinity in Grand Rapids and with Beaumont in southeastern Michigan, due to BCBSM's artificially low rates.

146. BCBSM's conduct is destroying A4's business, including by imposing an artificially low rate on A4.

147. Absent an injunction against BCBSM's anticompetitive actions, A4 will continue to be harmed and will eventually have to cease doing business in Michigan.

### VIII.    The *Love* Settlements Do Not Apply to A4's Claims.

148. Between 2005 and 2008, four settlement agreements were entered into in a class action in the Southern District of Florida, captioned *Love v. Blue Cross & Blue Shield Association, et al.*, No. 1:03-cv-21296-FAM (S.D. Fla.) ("*Love*").  Those settlements are the Blues Settlement Agreement, the WellPoint Settlement Agreement, the Highmark Settlement Agreement, and the Capital Settlement Agreement.  *See* 2:13-cv-20000-RDP, ECF 2902 at 1; *see also* 2:13-cv-20000-RDP, ECF 2221-4, 2221-6, 2221-7, 2221-8.

149. The settlements, together, provided for the class members to release certain claims "arising on or before the Effective Date, that are, were or could have been asserted against any of the Released Parties," *e.g.* 2:13-cv-20000-RDP, ECF 2324 at 3 (quoting ECF 2221-4 at § 13.1(a)), and "all Claims that exist now or that might arise in the future against BCBSA and/or any Blue Cross and/or Blue Shield licensee or wholly-owned subsidiary of such licensee, which Claims arise from, or are based on, conduct by any of the Released Parties that occurred on or before the Effective Date and are, or could have been, alleged in the Complaints, whether any such Claim was or could have been asserted by any Releasing Party on its own behalf or on

behalf of other Persons," *e.g.*, 2:13-cv-20000-RDP, ECF 2902 at 4 (emphasis omitted) (quoting ECF 2221-6 at 75 § 13.1(b)).

150.    A4's claims in this action arose on or after January 1, 2014, years after the effective date of the last *Love* settlement.  A4's claims arise from and are based on conduct that occurred on or after January 1, 2014, the earliest date on which BCBSM conspired with the BCBSA and other Blues.  A4's claims are based on allegations that could not have been alleged in *Love,* as they concern conduct that took place years after *Love*.  This action does not seek liability for any actions taken by Old BCBSM.

### First Cause of Action

### Violation of Section 1 of the Sherman Act (15 U.S.C § 1)

151.    A4 re-alleges and incorporates by reference the allegations set forth in paragraphs 1-150.

152.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold, or trebled, damages and interest.

153.    BCBSM entered into license agreements with the BCBSA on January 1, 2014, and again in 2016.  Through these agreements, BCBSM conspired with other Blues nationwide to reduce competition.  As alleged more specifically above, BCBSM agreed to divide the country into geographic markets, referred to as service areas, in which BCBSM and the Blues will, with limited exceptions, not compete with each other.  BCBSM also agreed with the other Blues to restrict the amount of revenue generated by their non-Blue subsidiaries.  This output restriction thereby ensured that the Blues did not circumvent the geographic restrictions by competing under other brand names.  BCBSM's anticompetitive conduct with the other Blues has no pro-competitive effect, and to the extent any such effect exists, it is outweighed by the harms to

competition from that conduct.  BCBSM's conspiracy with the other Blues represents a contract, combination, or conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

154.    As alleged more specifically above, BCBSM's license agreements also enabled BCBSM to, alongside the other Blues, fix prices and boycott providers.  This aspect of BCBSM's agreements has no pro-competitive effect, and to the extent any such effect exists, it is outweighed by the harms to competition caused by it.  This aspect of BCBSM's license agreements represents a contract, combination, or conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

155.    BCBSM's anticompetitive conduct has resulted in the quality and quantity of anesthesiology care in Michigan being reduced and resulted in increased quality-adjusted prices for consumers.

156.    As a direct and proximate result of BCBSM's continuing violations of Section 1 of the Sherman Act, A4 has suffered and continues to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes BCBSM's conduct unlawful.  These damages include, but are not limited to, having been paid less for anesthesiology services than A4 would have been paid but for the conspiracy.

## Second Cause of Action

### Violation of Section 2 of the Sherman Act (15 U.S.C § 2) – Monopsonization

157.    A4 re-alleges and incorporates by reference the allegations set forth in paragraphs 1-150.

158.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

159.    BCBSM has engaged in conduct by which it has created or maintained monopsony power in the market of insurers competing to purchase anesthesiology services in Michigan.

160.    BCBSM created or maintained monopsony power willfully, through anticompetitive acts including, beginning on or after January 1, 2014, conspiring with other Blues to reduce competition in Michigan's healthcare markets, by excluding Blues that otherwise would compete in those markets.  In exchange, BCBSM agreed to restrict itself from competing with other Blues in other states' markets.

161.    BCBSM's conduct had the purpose and effect of reducing competition in the market for purchasing anesthesiology services in Michigan.

162.    By willfully creating or maintaining monopsony power, BCBSM has violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States."

163.    BCBSM's creation or maintenance of monopsony power has resulted in the quality and quantity of anesthesiology care in Michigan being reduced and resulted in increased quality-adjusted prices for consumers.  BCBSM's actions have no pro-competitive effects, and to the extent any such effect exists, it is outweighed by the harms to competition from those actions.

164.    As a direct and proximate result of BCBSM's continuing violations of Section 2 of the Sherman Act, A4 has suffered and will continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes BCBSM's conduct unlawful.  These damages include, but are not limited to, having been paid less for anesthesiology services than A4 would have been paid but for BCBSM's creation or maintenance of monopsony power.

**Third Cause of Action**

**Violation of Section 2 of the Sherman Act (15 U.S.C § 2) – Attempted Monopsonization**

165.    A4 re-alleges and incorporates by reference the allegations set forth in paragraphs 1-150.

166.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

167.    As alleged more specifically above, BCBSM has engaged in conduct by which it has attempted to create or maintain monopsony power in the relevant product markets and geographic markets described above.

168.    BCBSM attempted to create or maintain monopsony power willfully, through anticompetitive acts including, beginning on or after January 1, 2014, conspiring with other Blues to reduce competition in Michigan's healthcare markets, by excluding Blues that otherwise would compete in those markets.  In exchange, BCBSM agreed to restrict itself from competing with other Blues in other states' markets.

169.    BCBSM's conduct had the purpose and effect of reducing competition in the market for purchasing anesthesiology services in Michigan.

170.    By attempting to create or maintain monopsony power, BCBSM has violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States."  Even to the extent BCBSM has not yet created or maintained monopsony power, its conduct has created a dangerous risk of success.

171.    BCBSM's attempts to create or maintain monopsony power have resulted in the quality and quantity of anesthesiology care in Michigan being reduced and increased quality-adjusted prices for consumers.  BCBSM's actions have no pro-competitive effects, and to the extent any such effect exists, it is outweighed by the harms to competition from those actions.

172.     As a direct and proximate result of BCBSM's continuing violations of Section 2 of the Sherman Act, A4 has suffered and will continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes BCBSM's conduct unlawful.  These damages include, but are not limited to, having been paid less for anesthesiology services than A4 would have been paid but for BCBSM's attempted creation or maintenance of monopsony power.

**Fourth Cause of Action**

**Claim for Injunctive Relief under Section 16 of the Clayton Act (15 U.S.C § 26)**

173.     A4 re-alleges and incorporates by reference the allegations set forth in paragraphs 1-150.

174.     BCBSM entered into license agreements with the BCBSA on January 1, 2014, and again in 2016.  Through these agreements, BCBSM conspired with other Blues nationwide to reduce competition.  As alleged more specifically above, BCBSM agreed to divide the country into geographic markets, referred to as service areas, in which BCBSM and the Blues will, with limited exceptions, not compete with each other.  BCBSM also agreed with the other Blues to restrict the amount of revenue generated by their non-Blue subsidiaries.  This output restriction thereby ensured that the Blues did not circumvent the geographic restrictions by competing under other brand names.  BCBSM's anticompetitive conduct with the other Blues has no pro-competitive effect, and to the extent any such effect exists, it is outweighed by the harms to competition from that conduct.  BCBSM's conspiracy with the other Blues represents a contract, combination, or conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

175.     As alleged more specifically above, BCBSM's license agreements also enabled BCBSM to, alongside the other Blues, fix prices and boycott providers.  This aspect of BCBSM's agreements has no pro-competitive effect, and to the extent any such effect exists, it is

outweighed by the harms to competition caused by it. This aspect of BCBSM's license agreements represents a contract, combination, or conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

176.    BCBSM's anticompetitive conduct has resulted in the quality and quantity of anesthesiology care in Michigan being reduced and resulted in increased quality-adjusted prices for consumers.

177.    BCBSM's conspiring with other Blues has also created or maintained (or constituted an effort to create or maintain) monopsony power in the market for purchasing anesthesiology services in Michigan, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. BCBSM's actions have thus reduced competition in the market for purchasing anesthesiology services in Michigan.

178.    As a direct and proximate result of BCBSM's continuing violations of Section 1 and Section 2 of the Sherman Act, A4 has suffered and continues to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes BCBSM's conduct unlawful. These damages include having been paid less for anesthesiology services, losing employees who go to work in other states where anesthesiology rates are higher than the artificially repressed rates in Michigan, and increased costs of recruiting and retaining anesthesiologists.

179.    BCBSM's unlawful conduct threatens to continue to injure A4. A4 seeks a permanent injunction prohibiting BCBSM from continuing its violations and to take appropriate remedial action to correct those violations, including by eliminating any remaining effects of those violations.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff A4 respectfully requests that this Court:

A.      Permanently enjoin BCBSM from entering into, honoring, or enforcing any agreements that restrain competition among health insurers in Michigan to the detriment of anesthesiology providers.

B.      Permanently enjoining BCBSM from taking anticompetitive actions to create or maintain market power in the above product and geographic markets.

C.      Permanently enjoin BCBSM from retaliating against A4 or any medical facility with which A4 works in response to A4's participation in this litigation or the enforcement of these remedies;

D.      Declare that BCBSM's agreements to limit competition among the Blues are illegal and unenforceable;

E.      Award A4 treble damages for BCBSM's violations of the Sherman Act in an amount to be proven at trial;

F.      Award costs and attorneys' fees to A4;

G.      Award prejudgment interest;

H.      Award punitive damages to A4 in an amount to be determined at trial; and

I.      Award any such other and further relief as may be just and proper.

## JURY DEMAND

A4 demands a trial by jury on all issues so triable.


Dated:  September 20, 2024

                                        Respectfully submitted,

                                        */s/ David Barillari*
                                        Jonathan D. Schiller
                                        David Barillari
                                        BOIES SCHILLER FLEXNER LLP
                                        55 Hudson Yards

New York, NY 10001
(212) 446-2300
jschiller@bsfllp.com
dbarillari@bsfllp.com

*Counsel for Plaintiff Anesthesia Associates of Ann Arbor, PLLC*

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that on September 20, 2024, he caused a true and correct copy of the foregoing document to be served using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

_/s/ David Barillari_
David Barillari
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Tel. (212) 446-2300
dbarillari@bsfllp.com
